**Charles W. SIMPSON, Plaintiff,**

v.

**Justin BRAIDER, et al., Defendants.**

**Civ. A. No. 84–0977.**

United States District Court,
District of Columbia.

Feb. 5, 1985.

---

Joseph D. Gallagher, Gill & Sippel, Rock-
ville, Md., for plaintiff.

D'Ana E. Johnson, Macleay, Lynch, Bernhard & Gregg, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

ARTHUR L. BURNETT, Sr., United States Magistrate.

On March 28, 1984 plaintiff, Charles W. Simpson, filed suit in this court, based on diversity of citizenship, against Justin Braider, and his parents, Frank and Edna Braider, arising out of an alleged incident of April 25, 1983 involving Justin Braider's shooting of a BB pellet gun from a window of an apartment on M Street, N.W. near Georgetown University, where he was a student, resulting in the projectile striking Mr. Simpson in the back of the neck. In addition to alleging causes of action against Justin Braider for assault and battery and alternatively, for negligence, the plaintiff also alleged a cause of action of negligence against the parents. Specifically plaintiff averred:

"Due to a long history of violent acts which included the shooting of rifles and pellet guns at members of the general public who were walking on the street, Defendants Frank Braider and Mrs. Frank Braider knew or should have known that Defendant Justin Braider posed a danger to members of the public at large; he especially posed the danger of his indiscriminate firing of firearms at members of the public. Although Defendants Frank Braider and Mrs. Frank Braider had Defendant Justin Braider within their dominion and control, supported him and knew, or should have known of the danger to the public which Justin Braider represented, Defendants Frank Braider and Mrs. Frank Braider failed to exercise any degree of care whatsoever in their control of Justin Braider. Such failure to exercise care in their control of Justin Braider constituted negligence on the part of Defendants Frank Braider and Mrs. Frank Braider." (Complaint, Paragraph 12.)

Plaintiff has demanded judgment against Mr. and Mrs. Frank Braider, jointly and severally, for the sum of $1,000,000 as compensatory damages, plus interest and costs. Plaintiff has demanded trial by jury on all issues.

During the course of pretrial discovery, depositions of Frank and Edna Braider of September 4, 1984 were terminated because of defendants Frank and Edna Braider's refusal to answer what plaintiff has characterized as "several critical questions propounded by Plaintiff's counsel" concerning their knowledge prior to April 25, 1983 of Justin Braider's "dangerous tendencies." In a motion to compel discovery and for sanctions, filed October 4, 1984, plaintiff asserted:

"In order to establish the factual background indicating that Defendants Frank and Edna Braider knew or should have known of the dangerous tendencies of Defendant Justin Braider, Plaintiff attempted to inquire at the depositions of Defendants Frank and Edna Braider into the history of psychological treatment of Defendant Justin Braider. Plaintiff also sought to inquire into the knowledge of Defendants Frank and Edna Braider of any prior arrests of Justin Braider. After first acknowledging that Justin Braider had been under the care of a psychologist and had at some time been hospitalized, Defendants refused to answer any questions regarding the psychological or psychiatric treatment or confinement of Defendant Justin Braider. The ground asserted for the refusal was the physician-patient privilege. Defendants also refused to answer any questions regarding prior arrests of Justin Braider on the grounds that such information was irrelevant."

Counsel for the plaintiff in his motion to compel further observed that Justin Braider had been prosecuted for the shooting of the plaintiff in Criminal Case No. F–2427–83 in the Superior Court for the District of Columbia and that in the course of that case the history of Justin Braider's psychological, mental or emotional disorders, which allegedly had contributed to the

shooting, had been placed on the record by his defense counsel in mitigation at the time of sentencing to misdemeanor disposition of the case.[1] Subsequently, counsel for the plaintiff argued that this action by defense counsel for Justin Braider in the criminal case constituted a waiver of the physician-patient privilege.

In support of the motion to compel plaintiff argued that Federal Rules of Evidence 501 triggers local law in a circumstance such as this, and thus, in the District of Columbia, the privilege is governed by section 14–307 of the District of Columbia Code. Based on a literal reading of the terms of the section, plaintiff's counsel urged that the privilege only applies to prevent disclosure by the physician without the consent of the patient. He thus contended that Section 14–307 had no application to third parties such as Frank and Edna Braider and therefore their knowledge with respect to the psychological and psychiatric history of Justin Braider was clearly not subject to the physician-patient privilege.[2]

The defendants opposed the motion to compel discovery and for sanctions, asserting that the physician-patient privilege had been properly invoked by Justin Braider himself and that under the statute, while he is alive, only he can waive it, citing *In re Estate of Wilson*, 416 A.2d 228 (D.C.App. 1980). Thus, counsel for the defendants contended that Frank and Edna Braider, under Section 14–307, did not have the power to waive the privilege; they could only do so if Justin Braider were deceased and they were his legal representatives. Further, counsel suggested that Mr. and Mrs. Frank Braider were third-parties involved in the relationship between Justin Braider

and his doctors and psychologists, and thus they were in a position to be aware of facts concerning Justin Braider's treatment, which, if revealed, would violate Justin Braider's statutory privilege, citing *Pollitt v. Mobay Chemical Corp.*, 95 F.R.D. 101, 104 (S.D.Ohio 1982), for the proposition that "in some limited circumstances third-parties to the relationship may raise the privilege."

After a review of the court record, and preliminary research having disclosed no judicial precedent by any court in the District of Columbia, the Magistrate ordered the defendants Frank and Edna Braider to appear before the Magistrate for the resumption of their respective depositions—

"to testify further as to their knowledge as of April 25, 1983 concerning the existence of mental or emotional disorder of their son, Justin Braider, and his tendencies to engage in violent acts, with a decision on the question of whether counsel for the plaintiff can inquire into any course of treatment by a psychiatrist or medical doctor and as to any conversations with psychiatrists or medical doctors by the parents, Frank and Edna Braider, in view of the statutory physician-patient privilege of D.C.Code § 14–307 (1981), being reserved until the supplemental depositions before the Magistrate."

Further, the Magistrate directed counsel for the plaintiff to file a supplemental memorandum "on the issue whether the parents can be required to disclose what a psychiatrist may have told them about their child, while a minor, notwithstanding the child, who has since become an adult, refusing to waive the physician-patient

---

**1.** Counsel for the plaintiff has represented that Justin Braider entered pleas of guilty to the charges of possession of a prohibited weapon and simple assault and that on February 14, 1984 he was sentenced to one (1) year, with four (4) days incarceration with the balance suspended and probation for three (3) years with a community service obligation and a requirement of restitution in the amount of $10,000, payable at the rate of $100 per month.

**2.** At a subsequent hearing counsel urged that were the privilege applied in this situation, the plaintiff would be unable to establish the factual grounds to establish the parents' liability. The Magistrate disagreed, suggesting that the parents could have acquired knowledge of dangerous propensities of Justin Braider, their son, if they existed, from neighbors, school teachers, law enforcement officials and Justin Braider's friends.

privilege"[3] and counsel for the defendants was required to file a responsive supplemental memorandum. Preliminary to the resumption of the depositions at a hearing on December 11, 1984, the Magistrate heard argument from counsel on the issue. The Magistrate ordered resumption of the depositions as to what knowledge Frank and Edna Braider may have had from neighbors, friends, school teachers, teenage associates of their son, Justin Braider, or law enforcement officers concerning any dangerous propensities or violent conduct of Justin Braider and ruled that what others told them would be relevant and probative on the issues of notice and their knowledge, but reserved ruling on the issue of whether they could be compelled to answer questions concerning communications with psychiatrists, or other medical personnel or psychologists who had treated Justin Braider.

Thereafter the following questions were certified from Mr. Braider's deposition testimony of December 11, 1984:

Q. At that time [spring of 1982], do you know how often Justin was seeing Dr. Dunne?

\*     \*     \*     \*     \*     \*

Q. Now, did there come a time in May of 1982 when Justin broke into a shoe store?[4]

\*     \*     \*     \*     \*     \*

Q. Now did Dr. Shelsky make any recommendations for further treatment

upon Justin's release from St. John's?

\*     \*     \*     \*     \*     \*

Q. At the time Dr. Shill requested that you meet with him, did he give you any reasons for the request?

\*     \*     \*     \*     \*     \*

Q. Without relating the contents of any conversations that may have occurred between Dr. Shill and Justin, did Dr. Shill give you any examples of conduct on Justin's part that gave him concern and gave rise to his request for relief?

A. Yes. It was not a question of conduct, though. It was a question of the ability to cope with the difficulty of school.

Q. What did he tell you?

Ms. Johnson: Objection.

\*     \*     \*     \*     \*     \*

Q. Now, expanding from this one meeting that we have spoken about, was there any occasion during your visit to Georgetown University when Dr. Shill made a recommendation to you that Justin either take a medical leave of absence or be hospitalized?

Ms. Johnson: Objection.

The following was certified from Mrs. Edna Braider's deposition testimony:

Q. Did Dr. Shill explain to you why he thought Lithium was appropriate under the circumstances?

\*     \*     \*     \*     \*     \*

---

**3.** Counsel for the plaintiff in his supplemental memorandum advised that he had been unable to locate "any authority dealing specifically with the question whether the parents of a child who has reached majority can be compelled to disclose communications from a psychiatrist regarding treatment of the child when the communications occurred during minority." He then asserted, "[n]evertheless, it is respectfully submitted that the statute here in question, sound policy reasons, and the peculiar facts of this case all dictate that disclosure should be compelled." Further, he urged that the statute should be strictly construed as being in derogation of the common law, since at common law there was no physician-patient privilege. *In re Estate of Wilson,* 416 A.2d 228, 233 (D.C.App.

1980). He also contended the privilege should be strictly construed because it tends to suppress the truth, and thus the privilege should not be extended beyond its precise terms.

**4.** Mr. Braider refused to answer on the basis that he was told by a New York District Attorney that the incident was expunged—totally cleared—and thus a non-record. The Magistrate rejects the reason given for the witness' refusal, but since the answer would not be relevant, the Magistrate declines to compel the witness to answer. Many youngsters may break into a store. This would not, by itself, establish mental problems or that a person is prone to violence upon other persons.

Q. Did Dr. Shill explain to you why he thought Lithium was an appropriate prescription under the circumstances?

A. Yes, he did.

Q. What did he tell you?

\* \* \* \* \* \*

Ms. Johnson: \* \* \* I'll object and say that she cannot answer the question.

As previously noted, this is a diversity case. It is a suit arising out of an incident occurring in the District of Columbia involving the common law torts of assault, battery, and negligence. It is only in the federal district court because of diversity of citizenship of the parties. Thus, it is incumbent upon us to interpret and apply the law of privilege under Section 14–307 of the District of Columbia Code as the District of Columbia Court of Appeals would, as the highest court for the District of Columbia.[5]

*The D.C. Code Provision, Section 14–307, and its Legislative History*

In its current form, the relevant portion of Section 14–307 reads:

"(a) In the Federal courts in the District of Columbia and District of Columbia courts a physician or surgeon or mental health professional as defined by the District of Columbia Mental Health Information Act of 1978 (D.C.Code, sec. 6–1611 [6–2001] et seq.) may not be permitted, without the consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, that he has acquired in attending a client in a professional capacity, whether the information was obtained from the client or from his family or from the person or persons in charge of him.

(b) This section does not apply to:

(1) evidence in criminal cases where the accused is charged with causing the death of, or inflicting injuries upon, a human being, and the disclosure is required in the interests of public justice;

(2) \* \* \*

(3) \* \* \* "[6]

■ Our research discloses that the origin of this provision goes back to 1896, the Act of May 25, 1896, ch. 245, 29 Stat. 138 (1896). According to the legislative history the purpose of this provision was to provide for a statutory physician-patient privilege, as had been enacted in several States at that time, to place physicians in the same legal relationship with their patients, concerning communications of a confidential nature, as existed between an attorney and his client concerning communications made to him by the client in that relationship. S.Rep. No. 481, 54th Cong., 1st Sess. (1896); H.R.Rep. No. 1677, 54th Cong., 1st Sess. (1896); 57 Cong.Rec. 5068–71. The Attorney for the District of Columbia in a letter to the House Committee on the District of Columbia, dated December 23, 1895, stated the object of the bill was "to place physicians on the same plane with lawyers as to confidential communications in the course of their employment." H.Rep. No. 1677, 54th Cong., 1st Sess. 2 (1896). That the physician-patient privilege was to have the same breadth and scope as the attorney-client privilege is evident from the House report language rejecting the arguments of the justices of the then Supreme

---

**5.** Normally in diversity cases, Fed.R.Evid. 501 requires application of the state law of privilege. See, *e.g., Massachusetts Mutual Life Insurance Co. v. Brei,* 311 F.2d 463, 466 (2d Cir.1962), where the Court held that *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), required the application of the New York rule on physician-patient privilege in a diversity action because the privilege is substantive rather than procedural. *See* discussion in *Railroad Salvage of Conn., Inc. v. Japan Freight Consolidators (U.S.A.) Inc.,* 97 F.R.D. 37, 39 (E.D.N.Y.1983); 48 ALR Fed. 264–267. Prior to

Rule 501 the weight of authority seemed to have been that the privileges involved "substantive" rights conferred by state law.

**6.** It is significant to note that independent of Fed.R.Evid. 501, this section, by its explicit terms, is applicable in the Federal courts in the District of Columbia. Further, it appears that it matters not whether the case is in Federal court in the District of Columbia on diversity grounds or based on federal question jurisdiction.

Court of the District of Columbia against the bill [7] as follows:

"We respectfully differ with the learned justices when speaking of the principle as applied to attorney and client, that 'no such reason exists or applies as to communications made by a patient to a physician.'

"We think the reason exists with greater force where the character and reputation, the health and life of the patient are involved. The issues of life and death are placed in the hands of the trusted family physician. The patient should frankly, freely, truthfully, unreservedly make disclosures to the doctor, *and he in turn should be at perfect liberty to ask for and demand all the information bearing upon the disability that would enable him to properly diagnose the case and apply the remedy,* without being compelled to make disclosures thereof in court or elsewhere." H.R.Rep. No. 1677, 54th Cong. 1st Sess. 4 (1896) (emphasis added).[8]

The views expressed by the Medical Society for the District of Columbia in its correspondence fully supported this broad scope of the privilege, for it stated:

"The bill is intended to protect physicians from the compulsory disclosure of information acquired in a professional capacity and which may be necessary to enable them to manage cases of sickness with intelligence and success." H.R.Rep. No. 1677, 54th Cong., 1st Sess. 5 (1896).

Obviously in the case of an infant or minor, and in the case of a mentally incompetent person, it would be essential for the psychiatrist to talk to immediate family members to obtain the relevant medical history.

As indicated above, the physician-patient privilege was to be of the same scope as the attorney-client privilege.[9] At common law the presence of a third party, who was a participant in the attorney-client communication, intended to be confidential, did not vitiate the privilege. *Robson v. Kemp,* 4 Esp. 233, 235, 170 Eng.Rep. 703 (1803); *Doe Dem. Peter v. Watkins,* 3 Bing. (N.C.) 421, 132 Eng.Rep. 472 (C.P.1837); 8 Wigmore Evidence § 2316 (McNaughten Rev. 1961). Since the patient is to be considered in the same posture as a client in an attorney-client situation, based on the legislative history of Section 14–307 the patient should have the right, to the same extent as a client of an attorney, to prevent disclosure of confidential communications by a third

7. The justices had opposed the bill on three grounds. First, they maintained that no physician-patient privilege had existed at common law and that it existed by statute only in a few States. Second, they contended that there was no occasion for the provision excluding information obtained from the family or others attending the patient, since the rule of evidence excluding hearsay testimony already accomplished this purpose. Third, they felt passage of the bill would be detrimental to the administration of justice in learning the truth.

8. The emphasized language clearly supports the position that in treating a minor for mental illness, a psychiatrist would be entitled to obtain information from the parents and other immediate family members in the household concerning the behavior of the minor patient and that the psychiatrist could not be compelled to disclose what the parents or siblings told the psychiatrist for purposes of enabling the psychiatrist to diagnose the nature and extent of the mental illness. Further, it appears that the psychiatrist in applying a remedy could advise the

parents and siblings as to how they should relate to the minor plaintiff in order to treat the patient and assist in the minor's recovery. Certainly from this passage it is obvious that the doctor-psychiatrist could not be compelled to disclose what he told the parents and siblings to do as a part of the course of treatment.

9. We should note that there was to be one important exception. The common law rule as applied to attorneys was modified in the proposed legislation in its application to physicians with respect to criminal cases where the accused is charged with causing the death of, or inflicting injuries upon, a human being and the disclosure is required in the interests of public justice. The House Committee on the District of Columbia expressly noted this modification:

"Communications made to his attorney by the veriest criminal are privileged. Not so under this act by communications made by the patient to his physician, where the accused is charged with causing death or inflicting injuries on a human being." H.R.Rep. No. 1677, 54th Cong., 1st Sess. 4 (1896).

party present and involved in the confidential communications to a psychiatrist.[10]

## The Scope of the Privilege

Literally read, Section 14–307 of the District of Columbia Code includes within the embrace of the privilege information obtained by a physician from the patient's family or from the person or persons in charge of him. The legislative history also fully supports this view. Further, in its present form Section 14–307 includes within its scope not only physicians, including psychiatrists, but also other mental health professionals.[11] Thus, it is clear beyond doubt that under Section 14–307 the psychiatrist treating Justin Braider could not be compelled to disclose in court at trial—and we also construe this to include in a deposition in pretrial discovery—what Frank and Edna Braider related to the psychiatrist to assist the psychiatrist to diagnose Justin Braider's mental or emotional problems in order to decide on a proper course of treatment. The question in this case is whether the third parties, Frank and Edna Braider, can be compelled to disclose what the psychiatrist himself could not be compelled to reveal as to what they told him. The further question is whether the psychiatrist could be compelled to disclose what he told Frank and Edna Braider in response to all the information received about Justin Braider's mental and emotional problems in connection with prescribing a course of treatment and a remedy, and if the psychiatrist could not be compelled to reveal his communications, could Frank and Edna Braider be compelled to disclose what the psychiatrist told them.

Where it appears reasonably necessary for a psychiatrist to give certain advice to the parents, such as Frank and Edna Braider, to further the accomplishment of the

purpose for which a minor had consulted the psychiatrist, the Magistrate concludes that the communication should be treated as part and parcel of the privilege, essential to achievement of the objectives for which the privilege exists. In such a situation the parents should be considered impliedly authorized to invoke the privilege on behalf of the patient, who was a minor at the time of the treatment. Such a rationale is supported by *Rudnick v. The Superior Court of Kern County,* 11 Cal.3d 924, 114 Cal.Rptr. 603, 523 P.2d 643 (1974) (In Bank). There the Supreme Court of California held that if a physician reported to a drug manufacturing company the adverse effects of a drug on his patient to obtain assistance in the use of the drug in treating the patient, such a disclosure, even when expressly consented to by the patient, would not constitute a waiver of the privilege, which would be fully applicable to the communication to the third party. In such a situation the patient would be entitled to have the confidential nature of his communications maintained notwithstanding the necessary further disclosure. In establishing the rule for the lower courts of California, the Supreme Court summarized its position thusly:

"We therefore hold that a disclosure in confidence by a physician, with or without the consent of the patient, of communications protected by the physician-patient privilege to a third person to whom disclosure is reasonably necessary for the accomplishment of the purpose for which the physician is consulted confers upon the third person the right to claim the physician-patient privilege on behalf of the patient.

\* \* \* \* \* \*

**10.** Compare *United States v. Bigos,* 459 F.2d 639 (1st Cir.1972), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972), where the court held that an inviolate and privileged communication existed where an indicted defendant's father was present with him at the consultation with his attorney.

**11.** Section 6–2001 of the District of Columbia Code defines "mental health professional" as

including a person licensed to practice medicine, a person licensed to practice psychology, a professional clinical or psychiatric social worker, a professional marriage, family or child counselor, a licensed nurse who is a professional psychiatric nurse, and any person reasonably believed by the client to be a mental health professional within the meaning of the above categories of individuals.

To summarize, defendants may claim the physician-patient privilege on behalf of a patient to bar discovery of the adverse drug reaction report submitted by his physician if the submission of such report was in confidence and was reasonably necessary in order to accomplish the purpose for which the physician was consulted." 114 Cal.Rptr. at 609–10, 523 P.2d at 649–50.

Certainly a similar rationale should apply to parents such as Frank and Edna Braider, who most likely furnished valuable medical history information concerning Justin Braider and received advice and instructions from the psychiatrist reasonably necessary to treat Justin Braider's emotional and/or mental disorder. It is highly improbable that any answers furnished by them concerning their knowledge of the dangerous propensities of Justin Braider could be totally separated from the confidential information they gave the psychiatrist for purpose of treating Justin Braider or from the advice and instructions they received from the psychiatrist to aid him with the remedy and treatment necessary for Justin Braider. The same would apply under Section 14–307 with reference to communications of a confidential nature to a psychologist. In the words of the *Rudnick* court, communications of a psychiatrist or psychologist with the parents in obtaining information on their then minor son and in giving them advice and instructions would certainly be "reasonably necessary in order to accomplish the purpose for which the [psychiatrist or psychologist] was consulted."

After extensive legal research, the most analagous case we have been able to locate is another California case, this by an intermediate appellate court. In this case, *Grosslight v. Superior Court of Los Angeles County*, 72 Cal.App.3d 502, 140 Cal. Rptr. 278 (App.1977), the petitioner was a girl approximately 16 years of age, who was one of the defendants in a civil action for personal injuries. Her parents were also party defendants on the theory that they had knowledge of the girl's dangerous propensities for violence and that they had

failed to exercise adequate control over her. In the course of pretrial discovery, plaintiff sought, by noticing the deposition of the custodian of records at a psychiatric hospital where the girl had been treated, to obtain information establishing the parents' knowledge. The petitioner, the 16 year old girl, sought a protective order. The trial court thereafter issued an order for an *in camera* examination by it of the records to determine whether there were any such records containing admissions by the parents of knowledge of the dangerous propensities of the daughter. The appellate court concluded that this order was in excess of the jurisdiction of the trial court and would invade the physician-patient privilege under section 1014 of the California Evidence Code, which provided that a patient had a privilege to refuse to disclose and to prevent others from disclosing a confidential communication between the patient and the psychotherapist. There the court observed that while the inclusion of the history given by the parents as being within the scope of the psychotherapist-patient privilege may ultimately benefit the parents in the lawsuit against them for negligent supervision, the inclusion of the history given by the parents to the hospital as within the scope of the privilege primarily and essentially benefited the patient, not the patient's parents. The court further elaborated:

"To include these communications by the parents as within the purview of the privilege encourages full disclosure of pertinent matters that otherwise might be withheld by the embarrassed parents to the detriment of the patient." 72 Cal. App.3d at 507, 140 Cal.Rptr. at 281.

Thus, the court concluded that a greater societal interest was served by protecting the communications as privileged and construing Section 1014 as including all relevant communications to psychotherapists and to psychiatric personnel by intimate family members of the patient, than by allowing the facts to be disclosed to establish the parents' liability in a civil case for

negligent supervision.[12]  Implicit here is a judgment that the injury to the physician-patient, and more particularly the psycho-therapist-patient relationship, caused by disclosure would far outweigh the resulting benefit to justice in an individual tort suit against parents for negligent supervision. See Comment, *Evidence: The Psychother-apist-Patient Privilege Under Federal Rule of Evidence 501*, 23 Washburn L.J. 708, 712 (1984).[13]

In this context it is significant to note that Congress in enacting the physician-patient privilege provided for an exception where a patient is charged in a criminal case with causing the death of, or inflicting injuries upon, a human being, and the disclosure is required in the interests of public justice.[14]  It, however, did not provide an exception in civil cases involving wrongful death or injuries to another person.  Had Congress intended the privilege not to apply in such a situation, it could have included language to this effect in Section 14–307(b)(1) making explicit reference to civil cases involving causing the wrongful death or the inflicting of injuries on a human being by a patient.  The absence of reference to civil cases involving death or infliction of injuries to a person clearly suggests that Congress intended the privilege to be applicable and that disclosure in such cases would not be justified, while, in criminal cases, the privilege would not apply and judges would have the power and discretion to require disclosure.

In this case the focus has been not on eliciting what the parents told psychiatrists or psychologists treating Justin Braider, but what they told them, if anything, concerning dangerous propensities, if any, of Justin Braider.  It would appear that a revelation of what the psychiatrists or psychologists told them would, of necessity, be reflective of what they had learned from the patient, from the parents, and from other sources, to which they had applied their medical or professional knowledge and experience, and thus communications

**12.** It is significant to observe that the court found some support for its position from the New York case of *Denaro v. Prudential Co. of America*, 154 App.Div. 840, 139 N.Y.S. 758 (1913) dealing with physical illness and the necessity of a doctor to inquire of immediate members of the family in a household in making a house call to attend a sick person.  *Grosslight* has been subsequently cited by the California Supreme Court with approbation.  See *De Los Santos v. Superior Court of Los Angeles County*, 27 Cal.3d 677, 166 Cal.Rptr. 172, 177, 613 P.2d 233, 237, (1980).

**13.** We have reviewed and considered *Brady v. Hopper*, 570 F.Supp. 1333 (D.Colo.1983), aff'd., 751 F.2d 329 (10th Cir.1984), involving a civil suit brought by plaintiffs, who were all shot and seriously injured by former patient, John W. Hinckley, Jr., of the psychiatrist defendant in the patient's attempt to assassinate the President, for alleged negligence in examining, diagnosing, and treating Mr. Hinckley and for failure to warn others of the danger posed by the patient.  While clearly the cause of action for failure to warn others of the danger posed by Mr. Hinckley could have involved inquiry into information furnished within the scope of the physician-patient privilege, the court did not reach or discuss this issue in granting the defendant's motion to dismiss on the ground that it was not foreseeable that the patient would attempt presidential assassination and, in the course thereof, injure the plaintiffs.  The court specifically noted that nowhere in the complaint were there allegations that Hinckley made any threats regarding President Reagan, or indeed that he ever threatened anyone, and concluded that liability of psychiatrists should be predicated on a rule of "specific threats to specific victims", such a rule being a workable, reasonable, and fair boundary upon the sphere of a therapist's liability to third persons for acts of their patients.  See *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976); *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980); and *Doyle v. United States*, 530 F.Supp. 1278 (C.D.Cal.1982), cited therein.  It is significant to note that the court in *Brady* observed that the defendant cited Colo.Rev.Stat. § 27–10–120(1) (1973), which provides that except in limited circumstances, all information obtained through the provision of counselling services under the mental health article shall be privileged and confidential, and that the defendant thus interpreted this statute as a legislative limitation on the *Tarasoff* duty to warn which existed under the California statute.  The court, concluding that the complaint did not aver sufficient allegations to establish a legal duty, did not return to a discussion of the privilege issue.

**14.** As noted *supra* n. 9, this is one area where the statutory physician-patient privilege in the District of Columbia differs from the scope of the common law attorney-client privilege.

to them by the patient and his parents would be integrally intertwined with these mental health professionals' advice to them concerning a course of treatment and in providing a remedy. Thus, as a practical matter, it may be impossible to separate the confidential communications to the psychiatrists and psychologists from their responses thereto and the advice given.

We have previously noted the analogy of the physician-patient privilege under Section 14–307 to the attorney-client privilege based on the legislative history of Section 14–307. As to the attorney-client privilege it has been stated that "although state courts are divided on the issue, federal courts have uniformly applied the privilege to communications from the attorney to the client as well as the reverse." See *Hearn v. Rhay,* 68 F.R.D. 574, 579 (E.D.Wash. 1975), citing *Garner v. Wolfinbarger,* 430 F.2d 1093, 1096 n. 7 (5th Cir.1970); *Schwimmer v. United States,* 232 F.2d 855 (8th Cir.1956); *8 in 1 Pet Products, Inc. v. Swift & Co.,* 218 F.Supp. 253 (S.D.N.Y. 1963), 8 Wigmore, Evidence, § 2320 at 630–31 (McNaughten Rev.1961); Cleary, McCormick on Evidence, § 89 at pp. 182–83. *See also United States v. Ramirez,* 608 F.2d 1261, 1267–68 n. 12 (9th Cir.1979). The United States Court of Appeals for the District of Columbia Circuit has concluded that this privilege applies to an attorney's communications to his client where the advice is based on confidential information provided by the client. *Mead Data Central, Inc. v. United States Department of Air Force,* 566 F.2d 242, 254 (D.C.Cir.1977).

■ It would thus appear equally appropriate to apply the physician-patient or psychotherapist-patient privilege to communications to a psychiatrist from the patient or from his individual family members as well as the reverse. This approach is clearly supported by the legislative history of this privilege. The House Report specifically stated:

"The object of this bill is to place a physician in the same legal relation to his patient, concerning communications made to him by his patient, of a confiden-

tial nature, as that recognized by the common law and enacted into statutory law by almost, if not every, State of the Union between an attorney and his client concerning communications made to him by his client in that relation, *or his advice to his client. The reason for the latter applies with equal force to the former."* H.R.Rep. No. 1677, 54th Cong., 1st Sess. 1 (1896). (Emphasis added.)

The Magistrate thus concludes that the privilege under Section 14–307 is fully applicable to communications from a psychiatrist or a psychologist to the parents of a patient who was a minor at the time and where the communications involved information, confidential in its nature, associated with, attending the minor patient in a professional capacity and which was necessary to enable the psychiatrist or psychologist to act in that capacity.

### Waiver of the Physician-Patient Privilege

■ As noted hereinabove, counsel for the plaintiff has alternatively argued that the privilege has been waived by Justin Braider in connection with the criminal prosecution against him in the Superior Court for the District of Columbia in connection with his lawyer explaining on the public record his mental illness or disorder before a judge of that court in connection with a failure to appear for a hearing and, subsequently, as mitigation in connection with sentencing on two misdemeanor charges to which Justin Braider had pled guilty.

The Magistrate concludes that these revelations in the Superior Court criminal case, since they were made in defense of criminal charges, cannot be truly considered voluntary. There Justin Braider was an accused, a defendant, and these revelations were made only to protect his interests in that proceeding. These were not revelations undertaken on his own initiative, where he sought advantage such as where a person seeks to use information to obtain an advantage, but then invokes priv-

ilege to preclude the adversary from challenging a claim.

■ This is another area in which our extensive research has revealed a dearth of judicial precedent. The only relevant case which we have located is *Novak v. Rathnam*, 119 Ill.App.3d 847, 75 Ill.Dec. 368, 457 N.E.2d 158 (App.1983), and there the court noted that no court in Illinois had previously decided the specific issue then before the court. Nor did that court cite and precedent from any other jurisdiction. The issue was whether a psychiatrist and a psychologist, both defendants in a civil suit for wrongful death, could be required to submit to discovery depositions and to testify as to their treatment of the third defendant in the civil case, Robert Lee Endicott. Plaintiff in the civil case had alleged that the two treating therapists had breached a duty to the general public and to the victim, Beverly Ann Novak, deceased, to protect them from injury by allowing Mr. Endicott to be released from the Zeller Mental Health Clinic. At the criminal homicide trial in Florida, the defendant Endicott had called them to testify as to their treatment. He was subsequently found not guilty by reason of insanity. Plaintiff contended that by testifying in the homicide trial the two therapists had waived the right to assert testimonial privilege on behalf of Mr. Endicott. The court concluded that no waiver under the Illinois privilege statute had occurred in view of statutory provisions which were very precise as to disclosure requirements, *i.e.* the Mental Health and Developmental Disabilities Confidentiality Act restricts consent to the disclosure of medical records and treatment by therapists, the consent must be in writing, and it prohibits blanket consent and advance consents, and no agreement to waive any provision of the Act is valid. The court concluded, in this context, that plaintiff's contention, that once testimony had been elicited from the therapists concerning treatment in the homicide case the

privilege was forever waived, was inconsistent with these statutory restrictions on disclosure. While the decision against waiver in this case was predicated on the restrictions in the statute rather than the involuntary nature of the psychiatrist and the psychologist testifying on behalf of a defendant in a criminal prosecution, we think it instructive on the judicial reluctance to find waiver.[15] A court should be reluctant to find a waiver of a privilege when testimony is involuntarily given such as pursuant to a subpoena, or to defend against criminal charges or under circumstances indicating there was realistically no voluntary disclosure. Cf. *Transamerica Computer v. International Business Machines*, 573 F.2d 646, 651 (9th Cir.1978); *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y. S.2d 419, 348 N.E.2d 894, 896 (1976); *People v. Fitzgerald*, 101 Misc.2d 712, 422 N.Y.S.2d 309 (1979).

■ It is noted that Justin Braider has since filed responses to interrogatories in which he has furnished the names of psychiatrists or psychologists he saw for treatment in 1982 and 1983 and has described the purpose of seeing these mental health professionals as being for "apparent change in mental outlook and functioning in social and familial settings." These brief responses and conclusory descriptions are not sufficient to support a finding of waiver. The disclosure of names of therapists, dates of visits and general purpose of treatment do not fall within the physician-patient privilege, *In Re Zuniga*, 714 F.2d 632 (6th Cir.1983), and thus disclosing this information was not the disclosure of privileged communications which would justify a finding of waiver.

For the foregoing reasons, the motion to compel answers by Frank and Edna Braider to the certified questions is hereby DENIED. Counsel shall proceed to complete any remaining discovery and to submit pretrial briefs for the pretrial conference set for March 4, 1985 so that this case may be

---

**15.** Our research has failed to disclose that the *Novak* case has been cited in any case dealing with the waiver issue.

scheduled for trial in the near future. Should the parties wish to consent to trial, with or without a jury, before the Magistrate, an early trial can be assured.