**TRANSAMERICA COMPUTER COMPANY, INC., Plaintiff and Appellant,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant and Appellee.**

No. 76–2789.

United States Court of Appeals, Ninth Circuit.

April 20, 1978

Richard J. Lucas (argued), of Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for plaintiff and appellant.

Charles M. Waygood (argued), of Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant and appellee.

Before WATERMAN,* CARTER and KENNEDY, Circuit Judges.

WATERMAN, Circuit Judge:

■ On this interlocutory appeal brought pursuant to 28 U.S.C. § 1292(b) we are required to address the narrow issue of whether defendant-appellee International Business Machines Corporation ("IBM"), by virtue of its inadvertent production of certain documents in accelerated discovery proceedings in a prior unrelated antitrust lawsuit in which it was a defendant, has waived its right to claim here that those documents are privileged and therefore not discoverable by plaintiff-appellant Transamerica Computer Company, Inc. ("TCC"). The district court below held that under the circumstances in that prior antitrust case there had been no waiver by IBM. We affirm.

On October 5, 1973 TCC commenced the present private antitrust action against IBM by filing a complaint in the United States District Court for the Northern District of California. Pursuant to an order of the Judicial Panel on Multidistrict Litigation, TCC's antitrust suit was consolidated with six other similar suits which had been instituted against IBM. As part of its pretrial discovery, TCC requested that IBM produce numerous documents, and these documents included a group which the parties have designated, and which have come to be known as, the "JJ documents." Although IBM produced those portions of these documents which it believed were not privileged, IBM refused to comply with TCC's request that the documents be produced in their entirety, principally justifying its refusal on the grounds that the documents being withheld were protected by either the attorney-client privilege or the attorney's work product doctrine.[1] Following this refusal, TCC sought, pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, an order from the district court compelling the production of the portions of the JJ documents which had been withheld by IBM. In support of its request that IBM be compelled to produce the withheld documents, TCC took the position that, even assuming arguendo that the documents had, in fact, been privileged when originally prepared,[2] IBM had waived its right to rely upon the privilege as it had produced these very documents to Control Data Corporation in the antitrust action previously brought by that corporation against IBM (*Control Data Corporation v. International Business Machines Corporation*, Doc. No. 3–68 Civ. 312 (D.Minn.)) (the "CDC case"). The district court below, McNichols, J.,[3] denied TCC's motion, "find[ing] that the JJ documents were produced in connection with accelerated discovery proceedings [in

---

* The Honorable Sterry R. Waterman, Senior Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

1. IBM claims that the documents at issue are protected by either the attorney-client privilege or by the attorney's work product doctrine. While there is an important distinction between the rules governing when each type of protection has been waived, *see, e. g., Ceco Steel Products Corp. v. H. K. Porter Co., Inc.*, 31 F.R.D. 142, 143 (N.D.Ill.1962); *Vilastor-Kent Theater Corp. v. Brandt*, 19 F.R.D. 522, 524, 525 (S.D.N.Y.1956); *Connecticut Mutual Life Ins. Co. v. Shields*, 16 F.R.D. 5, 7–8 (S.D.N.Y. 1954); 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2024, at 209–10 (1970); Developments in the Law—Discovery, 74 Harv.L.R. 940, 1044–45 (1961), this distinction is unimportant here where the third person to whom the disclosure was made, a disclosure supposedly resulting in a waiver, was IBM's adversary in litigation. Thus, if IBM's inadver-

tent production of documents in the prior antitrust lawsuit constituted a waiver of the attorney-client privilege, under the circumstances it also resulted in a waiver of the protection of the work product doctrine. In this opinion, therefore, we shall loosely refer to both as either the "privilege" or "the attorney-client privilege."

2. For purposes of this appeal only, it is assumed that the JJ documents are privileged, the only question being whether that privilege has been waived. In view of our holding that the privilege has not been waived, it will be necessary for the district court to determine whether each of the JJ documents is, in fact, privileged.

3. Honorable Ray McNichols, Chief Judge, United States District Court for the District of Idaho, sitting by designation of the Judicial Panel on Multidistrict Litigation.

the CDC case] wherein the Presiding Judge sought and intended to protect the parties against assertions of waiver." Judge McNichols, however, certified that his order "involve[d] controlling questions of law as to which there are substantial grounds for differences of opinion and that an immediate appeal therefrom [might] materially advance the ultimate termination of the litigation." Consequently, he authorized TCC to apply to this court for permission to appeal pursuant to 28 U.S.C. § 1292(b) and Rule 5(a) of the Federal Rules of Appellate Procedure. TCC so applied and we granted its petition.

It is critical to our disposition of this appeal that we describe the unique circumstances under which IBM produced the so-called JJ documents in the CDC litigation. On October 19, 1970 United States District Judge Philip Neville of the U. S. District Court for the District of Minnesota, who was overseeing the pretrial proceedings in that case, issued a pretrial order which dramatically accelerated the document inspection program which had been in progress there. The effect of the order was to require IBM to produce within a three-month period for inspection and for adversary copying approximately 17 million pages of documents. To say the least, the logistical problems confronting IBM were monumental and were exacerbated by a number of factors. For example, the documents which CDC sought to have IBM produce for inspection had not been produced during any previous litigation and they were not grouped or batched together so as to be readily accessible. Most of the documents were particularly difficult to screen for privilege, for they were letters and memoranda contained in myriad headquarters-type files randomly strewn throughout various IBM branch offices and divisional headquarters.

To achieve compliance with the court's onerous production order, while at the same time seeking to preserve all its rights of privilege, IBM mounted a herculean effort to review and produce the material which had been requested. Inasmuch as much of the material was only partially privileged it was necessary that each and every one of the 17 million pages be carefully examined. In view of this fact, and because time was short and the amount of material to be produced so incredibly voluminous, IBM was compelled to seek assistance from outside attorneys unfamiliar with IBM's business or with the specifics of this particular lawsuit and to employ outside clerical help who lacked the motivation or the competence that full-time IBM employees would normally be expected to possess. Despite expedited training given to these outside personnel, the extensive use of workers who had been previously unfamiliar with the case obviously increased the risk that privileged material would be accidentally produced, and the probability that this might occur necessitated an additional IBM review of the material being examined by the outside help. This supplemental review was needed not only to prevent inadvertent production of privileged material but also to insure that documents which the outside reviewers had preliminarily classified as privileged documents were, in fact, properly withholdable by IBM. Furthermore, the existence of a substantial amount of material only partially privileged meant not only that every one of the 17 million pages had to be assiduously inspected, but also that, once partially privileged material was discovered, a cumbersome masking process had to be employed so that the unprivileged, properly discoverable portions of each document could be produced in compliance with the district court's production order. These logistical difficulties confronting IBM in the CDC case were further exacerbated by the fact that at the very time IBM was being compelled to produce the documents to CDC, it was also being compelled to produce the same documents to the United States Department of Justice in the gargantuan civil suit instituted by the United States against IBM in the United States District Court for the Southern District of New York.[4]

---

4. *United States v. International Business Machines Corporation*, 69 Civ. 200 (S.D.N.Y.).

In order to comply with the order compelling production, while at the same time doing all it possibly could do to preserve its right to withhold privileged documents, IBM attempted, in the minimal amount of time available to it, to develop effective screening procedures. In an affidavit submitted in support of IBM's motion in the CDC case for an order determining that under the unique circumstances there, any inadvertent production by IBM of certain allegedly privileged documents did not constitute a waiver of the privilege, Frederick A. O. Schwarz, Jr., a member of one of the law firms representing IBM, succinctly described "the various steps [taken by IBM], from initial review through [ultimate] production":

(a) The responsive files of 103 executives, 60 departments and other miscellaneous files had to be found in the files of 30 Branch Offices, 1 District Office, 5 Regional Headquarters, 1 Plant, Corporate Headquarters, Data Processing Group Headquarters, Data Processing Division Headquarters, Systems Development Division Headquarters, and World Trade Headquarters.

(b) Over 17 million pages had each to be separately turned by the reviewers, page by page;

(c) Once a page is turned over, it must be examined to determine if it may be privileged or partially privileged;

(d) Once a document is found which may be privileged, it must be (i) removed from its original file folder, (ii) placed in specially colored green folder, and (iii) that folder must be turned up on end within the original folder to enable a clerk to see it in the box or file receptacle;

(e) Once that is done, a clerk must then (i) find and remove the green folder from the box of producible documents, and (ii) make certain that the green folder has the box number, folder name, etc., information to associate it with its source;

(f) The material in a green folder must then be re-reviewed by a more experienced lawyer (i) to determine if it is in fact privileged or partially privileged, and

(ii) if partially privileged to indicate which material is partially privileged and which must then be blocked out (masked) by placing a strip of paper over the partially privileged material and then preparing a Xerox copy for reinsertion in the file and production to the plaintiffs;

(g) (i) The material found not to be privileged at all must then be placed back in the original file folder; (ii) the partially privileged material is then placed in another (blue colored) folder within the green folder with instructions for masking, and (iii) the wholly privileged material is passed on to another group required to fill out logs pursuant to the Court's Order.

(h) (i) The nonprivileged material is then removed and returned to the box of producible material, and (ii) the partially privileged material must be removed, masked and then returned for production.

Not surprisingly, after this process had been in effect for a short time, IBM realized that, despite its intensive screening efforts, a small number of privileged documents were evading detection by its reviewers and were slipping through the filtering net. In an attempt to prevent any further instances of such accidental production, an attorney characterized as the "interceptor" was placed by IBM in the room where CDC was inspecting the documents. His function, as his imposing appellation suggests, was to review all documents selected by CDC for copying and then to withhold from those so selected any privileged documents which the IBM reviewers had overlooked. CDC objected to the presence of this so-called "interceptor" and sought from the district court an order requiring his removal. Pursuant to CDC's request, a hearing was held on November 2, 1970 at which time Judge Neville ruled that the interceptor should be removed. More important, however, was the judge's contemporaneous ruling that henceforth the inadvertent production of allegedly privileged material by either party would not constitute a waiver of that party's right to claim the attorney-client privilege, provided only that the par-

ty disclaiming waiver had continued to employ procedures reasonably designed to screen out privileged material. Prior to November 2, CDC had procured 24 documents which IBM claimed were either completely or partially privileged and Judge Neville expressly reserved ruling on the question of whether IBM had waived any privilege it might have for these 24 documents.

Incredibly, IBM met the court's three-month production demand, and, in so complying, notwithstanding the previously described extensive screening procedures which resulted in the withholding of about 491,000 pages of documents, a relatively small number, 1138 (approximately 5800 pages), of supposedly privileged documents were inadvertently produced to CDC. These are the so-called "JJ documents."

The final significant event in the CDC case was an order issued by Judge Neville on April 18, 1972. The judge, noting that his ruling of November 2, 1970 had left open the question of the privileged status of any documents turned over to the opposing party prior to that date, now addressed that question, and, as well, the broader question of whether claims of privilege had been preserved for any documents produced at any time during the three-month period of accelerated discovery. Observing that "[c]ertain confusion and errors were bound to result in such a strenuous program," the judge ruled that all claims of privilege were preserved for documents produced prior to November 2, 1970 as well as for those produced after that date, and this preservation of privilege would be lost only if the parties had failed to employ reasonable screening techniques.[5]

Turning now to the legal theory upon which this important case must be decided,

we note first of all that the parties initially address the issue of whether a party having no subjective intention of waiving the attorney-client privilege may nonetheless waive that privilege if he produces privileged documents which he would not have produced had he realized their privileged status. In support of its position that under such circumstances there would be no waiver, IBM directs our attention to cases, *see, e. g., Dunn Chemical Co. v. Sybron Corp.*, 1975–2 Trade Cas. ¶ 60, 561, at 67, 463 (S.D.N.Y.1975); *Connecticut Mutual Life Ins. Co. v. Shields*, 18 F.R.D. 448, 451 (S.D.N.Y.1955), which IBM claims stand for the proposition that mere "inadvertent" production of privileged documents does not constitute a waiver of the privilege. TCC, on the other hand, adverting to cases such as *Underwater Storage, Inc. v. United States Rubber Co.*, 314 F.Supp. 546, 549 (D.D.C.1970) and *United States v. Kelsey-Hayes Wheel Co.*, 15 F.R.D. 461, 465 (E.D. Mich.1954), argues that, although under *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), a party certainly cannot effectively waive a *constitutional* right without knowledge on his part that he possesses such a right, the attorney-client privilege, being "a mere evidentiary privilege," is so easily waived that it may be waived by a party who, though not desiring to waive the privilege, nonetheless voluntarily produces or allows examination of privileged documents because at the moment he produces them he is unaware that they are, in fact, privileged documents.

We do not decide, however, whether this sort of "inadvertent" disclosure constitutes a waiver of the attorney-client privilege, for we believe that this case is properly decided upon the basis of a legal principle upon which the parties are in complete accord. Specifically, IBM asserts, and TCC

---

**5.** In his order of April 18, 1972 Judge Neville also expressly retracted an earlier ruling on the subject of waiver. Interpreting that earlier ruling of April 21, 1971 to have been that the parties in the CDC case had waived their right to claim privilege for "all privileged documents then in the possession of the other party [and] obtained before November 2, 1970," Judge Neville now, on April 18, 1972, found that his

ruling of April 21, 1971 had been "both erroneous and inadequate in scope."

We should also mention that in its brief on appeal TCC devotes considerable attention to an argument that, being a stranger to the CDC action, it is not bound by Judge Neville's ruling. IBM responds simply that it makes no claim that under the principles of *res judicata* TCC is so bound.

concedes, that a party does not waive the attorney-client privilege for documents which he is *compelled* to produce. Of course, despite this accord, the parties are in sharp disagreement over the result which should obtain when this legal principle is applied to the circumstances surrounding IBM's inadvertent production of privileged documents in the CDC case. IBM urges that under the rather extraordinary circumstances of the accelerated discovery proceedings in that case IBM's inadvertent production there of a limited number of privileged documents was, in effect, "compelled," and therefore no waiver of the privilege could be predicated upon such involuntary production. We agree.

■ Inasmuch as the parties agree that a disclosure of confidential material constitutes a waiver of the attorney-client privilege only if it is voluntary and not compelled, we shall not engage in any extended discussion of the principle. It suffices to say that the general principle finds support in the case law, *see, e. g., Schaffer v. Below*, 278 F.2d 619, 628 (3d Cir. 1960); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1163 (D.S.C.1974); *United States v. New Wrinkle, Inc.*, 1954 Trade Cas. ¶ 67, 883, at 69, 856 (S.D.Ohio 1954), in the treatises, *see, e. g.*, 3 Jones on Evidence § 21:22, at 804 n.14 (6th ed. 1972), and particularly in Rules 511 and 512 of the proposed Federal Rules of Evidence which were prescribed and approved by the United States Supreme court. Although these particular proposed rules were not ultimately adopted by Congress, both IBM and TCC acknowledge that the approval of these proposed rules by the Supreme Court establishes that the proposed rules constitute "a convenient comprehensive guide to the federal law of privileges as it now stands." *United States v. Mackey*, 405 F.Supp. 854, 857–58 (E.D.N. Y.1975) (Weinstein, J.). Proposed Rule 511 states that a privilege is waived if the "holder of the privilege *voluntarily* discloses or consents to disclosure of any significant part of the matter or communication." (Emphasis supplied.) Proposed Rule 512 is perhaps even more on point. This proposed rule would have prohibited the use of any

privileged matter if its disclosure had been "compelled erroneously" or had been "made without opportunity to claim the privilege." It is our belief that under the specific circumstances of the accelerated discovery proceedings in the CDC litigation, IBM's inadvertent production there of some privileged documents does not constitute a waiver of the privilege protecting the production of those documents, for that production was "made without [adequate] opportunity to claim the privilege."

■ Despite this general acceptance of the principle that waiver cannot result from compelled production, we have not found any case, other than the CDC case, which has considered the precise issue of whether de facto compulsion can result from the imposition of an extremely rigorous schedule for discovery. TCC, while conceding that "Judge Neville ordered IBM to produce a large number of documents to CDC in a relatively short time" and that "the volume of document production in the CDC case was unusually high," nonetheless strenuously maintains that, inasmuch as "he did not order IBM to produce documents which it considered privileged," Judge Neville did not "compel" IBM to produce the JJ documents. TCC further warns that the federal courts will be engulfed in a flood of collateral litigation should we hold that the inadvertent production of a privileged document in the context of accelerated discovery proceedings does not constitute a waiver of the privilege. To be sure, such a possibility exists. We think it fairly remote, however, for we are convinced that the accelerated discovery proceedings in the CDC litigation represent what is probably a truly exceptional and a unique situation. Having reviewed those proceedings, we experience no difficulty in holding, as we do here, that there the document inspection program imposed such incredible burdens on IBM that it would be disingenuous for us to say that IBM was not, in a very practical way, "compelled" to produce privileged documents which it certainly would have withheld and would not have produced had the discovery program

proceeded under a less demanding schedule. This is not to say that Judge Neville did not have the authority under Fed.R.Civ.P. 26(c) to require that discovery proceed at such a strenuous pace. There are, however, limits upon the power of the district court to accelerate pretrial discovery, *see, e. g., Freehill v. Lewis*, 355 F.2d 46, 48 (4th Cir. 1966), and it may well be that a demanding discovery schedule of the sort imposed by Judge Neville would be an unreasonable exercise of the district court's discretion unless it was, as it was there, coupled with an express preservation of claims of privilege.

We have already described at length the extraordinary logistical difficulties with which IBM was confronted in its efforts to comply, as it eventually did, with the demanding timetable Judge Neville had established for the document inspection program. We believe that there is merit in IBM's argument that that timetable deprived IBM of the opportunity to claim the privilege inasmuch as it was statistically inevitable that, despite the extraordinary precautions undertaken by IBM, some privileged documents would escape detection by the IBM reviewers. There were literally millions of ways for mistakes to be made in the screening process. For example, mistakes could easily occur during any of the millions of purely mechanical steps necessary for successful screening. In particular, inasmuch as 17 million individual pages had to be read, the physical failure to turn and examine a single one of those 17 million pages could result in the inadvertent production of privileged material. Moreover, as explained above, once privileged documents were located they had to be placed in green folders. The failure to perform so simple a mechanical act as the insertion of a document into a folder would also result in the production of privileged material. In addition to the plethora of opportunities for mechanical blunders, there were inherent in the process numerous opportunities to overlook privileged material resulting from what might be characterized as visual or judgmental mistakes. For instance, in order to identify privileged material it was

necessary for IBM examiners inspecting each of the 17 million pages to recognize a particular name out of myriad names as that of an attorney who had rendered advice to IBM, or to uncover in long textual passages a legal opinion which perhaps encompassed only a very few lines. Moreover, it is obvious that the chance of mistakes being made in the visual and judgmental steps of the screening process was considerably enhanced by the long hours that many of those most intimately involved in the screening were working, and by the necessary extensive utilization of outside personnel.

Although our conclusion that IBM did not waive its claim to its privilege because IBM did not have an adequate enough opportunity to claim it is based on our independent analysis of the circumstances surrounding IBM's inadvertent production of the JJ documents in the CDC case, we also find Judge Neville's rulings of November 2, 1970 and April 18, 1972 to be of especial importance. As the judicial officer directly in charge of supervising the discovery proceedings in that litigation, he was in an ideal position to determine whether the timetable he himself had imposed was so stringent that, as a practical matter, it effectively denied IBM the opportunity to claim the attorney-client privilege for documents it was producing for inspection by CDC. TCC acknowledges that waiver cannot be directly compelled, and Judge Neville's rulings recognize and we so hold, that neither can it be indirectly compelled.

Moreover, any documents produced after November 2, 1970, were produced under Judge Neville's ruling explicitly protecting and preserving all claims of privilege, provided only that the parties wishing to preserve privilege had engaged in suitable screening techniques. Obviously, IBM did not waive its right to claim the privilege as to any documents produced after that date. We point out that under Fed.R.Civ.P. 26(c)(2) the district judge presiding over discovery proceedings can dictate "the specified terms and conditions" upon which discovery may be had. This rule, which mere-

ly clarifies the former rule that allowed the issuance of " 'any other order which justice requires,' " 8 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2038, at 277 (1970), certainly empowers the court, inter alia, to set deadlines for completion of discovery. Particularly in "exceptional" cases, though, this power to establish deadlines is not unlimited, *see Freehill v. Lewis, supra,* 355 F.2d at 48, for the parties must be given a fair and adequate opportunity to develop their cases. *Id.* Of course, rule 26(c)(2) is broad enough to empower the district judge to achieve this objective in a number of ways. One reasonable method of accelerating the discovery proceedings without impinging upon the parties' right to prepare their cases properly was to do precisely what Judge Neville did, that is, to issue an order preserving claims of privilege.

Therefore, for the aforementioned reasons, the order of the district court, McNichols, J., denying TCC's motion to compel production of the JJ documents is affirmed.

KENNEDY, Circuit Judge, concurring:

If information protected by the attorney-client privilege is disclosed by compulsion, or by inadvertence even with the exercise of due care, difficult questions arise as to whether or not the privilege remains. Discussion of the subject has not been extensive, although language in some of the cases would indicate that in either circumstance the privilege would remain. *United States v. Grammer,* 513 F.2d 673, 676 (9th Cir. 1975); *United States v. Gurtner,* 474 F.2d 297, 299 (9th Cir. 1973); *In re Horowitz,* 482 F.2d 72, 81–82 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *see* 8 Wigmore, Evidence § 2326 (McNaughton rev. 1961). I agree with the court that in the special circumstances of the instant case there was no waiver of the privilege, and I concur in the judgment.