UNITED STATES of America,
Petitioner/Appellee/Cross-Appellant,

v.

Frank S. ZOLIN, Respondent/Appellee,

and

Church of Scientology of California
and Mary Sue Hubbard,
Intervenors/Appellants/Cross-Appellees.

Nos. 85–6065, 85–6105.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1986.

Decided Feb. 9, 1987.

City, and Donald C. Randolph, Los Angeles, Cal., for intervenors/appellants/cross-appellees.

Frederick Bennett, Co. Counsel, Los Angeles, Cal., for defendant/appellee.

John A. Dudeck, Jr., Tax Div., Dept. of Justice, Washington, D.C., and Charles H. Magnuson, Asst. U.S. Atty., Los Angeles, Cal., for petitioner/appellee/cross-appellant.

Before BROWNING, Chief Judge, GOODWIN and FARRIS, Circuit Judges.

FARRIS, Circuit Judge:

In July 1984, the Criminal Investigation Division of the IRS (Los Angeles District) began investigating L. Ron Hubbard's tax returns for the tax years 1979 through 1983. In October, the IRS served an administrative summons on the Clerk of the Los Angeles County Superior Court and requested that he produce certain documents relating to Hubbard's potential tax liability. (The Superior Court had obtained the documents in connection with an unrelated proceeding brought by the Church against a former member of the Church.) The Clerk willingly produced a number of documents, but refused to produce thirteen documents which had been ordered sealed by the Superior Court.

In January 1985, the Government initiated this action in an effort to compel the Clerk to produce the thirteen sealed documents. Shortly thereafter, the district court granted the motions to intervene which were brought by the Church and Mary Sue Hubbard. The Intervenors contended that each of the thirteen documents was either privileged, irrelevant, or both. They also argued that the summons was unenforceable because it was not issued pursuant to a "good faith" tax investigation.

Hearings were held in March and April. On April 30, 1985, the district court ruled

Eric M. Lieberman and Edward Copeland, Michael Lee Hertzberg, New York

that eight of the documents—exhibits 4–D, 4–E, 4–F, 4–G, 5–C, 5–G, 5–I, and 6–B— were irrelevant, privileged, or both, and did not need to be produced. It ruled that five documents—exhibits 5–K, 5–L, 5–O, 5–P, and 6–O—should be produced, but prohibited the IRS from disclosing them to another governmental agency except in connection with a criminal tax prosecution or with the court's approval. The court further ruled that the Intervenors had failed to prove that the summons was not issued in "good faith."

The Intervenors filed timely notice of appeal on July 1, 1985. The Government filed timely notice of cross-appeal on July 15, 1985. The order appealed from is a final order which disposes of all claims of all parties. We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

### A. *Mootness*

On January 24, 1986, during the pendency of this appeal, L. Ron Hubbard died. The Intervenors argue that because Hubbard's death has foreclosed the possibility of any further investigation of Hubbard's potential criminal tax liability, this proceeding has become moot. We reject that argument for the reason stated in *United States v. Author Services*, 804 F.2d 1520, 1522 n. 1 (9th Cir.1986).

### B. *Relevance of Exhibits 5–O, 5–P, and 6–O*

■ The IRS' power to examine records in connection with tax investigations is broadly construed. *See Liberty Financial Services v. United States*, 778 F.2d 1390, 1392 (9th Cir.1985); *De Masters v. Arend*, 313 F.2d 79, 87 (9th Cir.1963). The relevance of such evidence depends on whether it might throw light on the correctness of a taxpayer's returns. *United States v. Goldman*, 637 F.2d 664, 667 (9th Cir.1980). The Government must demonstrate a "realistic expectation" of relevance, rather than an "idle hope" of rele-

vance. *Id.* (quoting *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir.1968)).

The Government bases its claim that the three exhibits are relevant on the declaration of Agent Petersell, in which Petersell stated:

I have read the Petition to Enforce Internal Revenue Service Summons. Each of the items listed ... is relevant to the investigation of L. Ron Hubbard in one or more of the following respects:

A. Determining the extent to which income from the Church of Scientology inured to the benefit of L. Ron Hubbard.

B. Determining whether L. Ron Hubbard conspired with others to impair and impede the Internal Revenue Service in the administration of the tax laws.

C. Determining whether any violations of the Internal Revenue laws were done willfully with intent to evade tax.

The Government's other evidence of relevancy consists of three terse descriptions of the documents' contents in the petition for enforcement of the summons:

| | |
|---|---|
| 00000 (5–O) | LRH note regarding the Mayor of Clearwater, Florida, 22 March 1978. |
| PPPPP (5–P) | LRH Statement regarding money from Scientology, 16 Feb. 1978. |
| 000000 (6–O) | LRH handwritten note regarding the Fair Game policy. |

The record does not indicate the Government's sources for this information.

■ While the Government might have made a better showing, the district court did not clearly err in concluding that Petersell's declaration, when coupled with general descriptions of the documents in the petition to enforce the summons, was sufficient to establish the relevance of the documents. We do not ignore our statement in *Goldman:*

The Government's burden, while not great, is also not non-existent. The Government appears to argue that the mere assertion of relevance by [an IRS agent] satisfied that burden. Even to the extent this might be true for records concerning the tax years being examined,

relevance is not so clear when records for other years are sought. 637 F.2d at 667. Notwithstanding the fact that exhibits 5–O, 5–P, and 6–O all relate to years other than the tax years under investigation, we are satisfied that the district court, after balancing the indicia of relevancy against the impossibility of fully knowing the documents' contents before an actual review, did not clearly err in determining that the documents "might throw light" on the correctness of L. Ron Hubbard's return information.

### C. Waiver of Privilege As to Exhibits 5–K and 5–L

The Intervenors do not contest on appeal the relevance of exhibits 5–K and 5–L. Instead, they contend that the district court erred in ruling that privileges which might otherwise have applied to the two documents were waived by a voluntary delivery of the documents to Gerald Armstrong. In addition, they argue that the district court erred when it concluded that exhibit 5–L would not be protected by the attorney-client privilege even in the absence of waiver because the affidavit of Hubbard's former attorney was too vague and conclusory to validly assert the privilege.

■■■ The attorney-client privilege is to be strictly construed. *Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18, 24 (9th Cir.1981). *See* 8 J. Wigmore, *Evidence* § 2291 at 554 (McNaughton rev. 1961). The logic behind the strict construction of the attorney-client privilege applies with equal force to the marital communications privilege: like the attorney-client privilege, the marital communications privilege is "an obstacle to the investigation of the truth.... [that] ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* The burden of demonstrating the existence of an evidentiary privilege rests on the party asserting the privilege. *See United States v. Gann*, 732 F.2d 714, 723 (9th Cir.1984) (attorney-client privilege); *Weil*, 647 F.2d at 25 (evidentiary privileges generally). In order to establish the applicability of the attorney-client privi-

lege to a given communication, the party asserting the privilege must affirmatively demonstrate non-waiver. *See id.; United States v. Landof*, 591 F.2d 36, 38 (9th Cir. 1978).

■■■ The voluntary delivery of a privileged communication by a holder of the privilege to someone not a party to the privilege waives the privilege. *See Clady v. County of Los Angeles*, 770 F.2d 1421, 1433 (9th Cir.1985) (the voluntary disclosure of a privileged attorney-client communication constitutes waiver); *United States v. McCown*, 711 F.2d 1441, 1452–53 (9th Cir.1983) (the marital communications privilege is inapplicable to communications not intended to remain confidential); *Weil*, 647 F.2d at 24 (the voluntary disclosure of a privileged attorney-client communication constitutes waiver). Moreover, when the disclosure of a privileged communication reaches a certain point, the privilege may become extinguished even in the absence of a wholly voluntary delivery. *See In re Sealed Case*, 676 F.2d 793, 818 (D.C.Cir. 1982) ("Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the privilege."). Whether the circumstances of the delivery of exhibits 5–K and 5–L to Armstrong gave rise to a waiver of the otherwise applicable privileges is a mixed question of law and fact that we review *de novo*. *See United States v. McConney*, 728 F.2d 1195, 1199–1204 (9th Cir.1984) (en banc).

■■■ The district court held that all privileges potentially applicable to exhibits 5–K and 5–L were waived by a voluntary delivery of the documents to Gerald Armstrong. We agree. The Intervenors argue that the delivery could not have been voluntary since the correspondence between Armstrong and Hubbard contains no express indication that Armstrong intended to, or had Hubbard's permission to collect communications between Hubbard and his wife or between Hubbard and his attorneys.

Although Hubbard did not explicitly grant Armstrong access to attorney-client

or marital communications, Hubbard did, in a memorandum to Armstrong, grant Armstrong general permission to collect documents relevant to the proposed biography of Hubbard. The Intervenors' only argument in support of non-waiver is that Hubbard did not specifically grant Armstrong access to attorney-client and marital communications. More is required.

Since the attorney-client privilege which might otherwise have attached to exhibit 5–L was waived, we need not consider whether the attorney-client privilege was validly asserted by Hubbard's former attorney.

### D. *Limited Evidentiary Hearing*

We review for abuse of discretion. *See United States v. Stuckey*, 646 F.2d 1369, 1373 (9th Cir.1981). *See generally Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (a district court's decisions relating to discovery matters are reviewed for abuse of discretion).

 The purpose of the limited evidentiary hearing was to determine whether the summons enforcement proceeding was legitimate and in "good faith," rather than merely camouflage for an ulterior non-tax motive. The "good faith" standard seeks to prevent the IRS from becoming an information-gathering agency for other governmental agencies. *See United States v. LaSalle National Bank*, 437 U.S. 298, 317, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 (1978); *Stuckey*, 646 F.2d at 1373. The task is to identify " 'those rare cases where bald allegations of harassment or improper purpose can be substantiated.' " *Author Services*, 804 F.2d at 1523 (quoting *United States v. Church of Scientology of California*, 520 F.2d 818, 824 (9th Cir.1975)). The focal issue is whether an IRS investigation is motivated by legitimate tax purposes. *See United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964). The district court may properly limit evidentiary hearings on the "good faith" issue to prevent a frustration of legitimate Government objectives. *Church of Scientology*, 520 F.2d at 823–25.

 The Intervenors argue that the district court improperly limited its inquiry to the issue of whether the summons itself was issued in "good faith," and ignored the larger issue of whether the overall investigation was in "good faith." We reject that argument. At the hearing, C. Phillip Xanthos, the Branch Chief of the IRS Criminal Investigation Division (Los Angeles District), specifically testified to the legitimate tax-determination objectives of the investigation. This and other testimony was sufficient to support the district court's finding that the summons was issued in "good faith." *See LaSalle National Bank*, 437 U.S. at 317, 98 S.Ct. at 2368. *See also Stuckey*, 646 F.2d at 1376; *United States v. Zack*, 521 F.2d 1366, 1368–69 (9th Cir.1975).

### E. *Restrictions on IRS Disclosure of the Summoned Documents*

The district court ordered that "the documents produced in response to the summons shall not be delivered to any other government agency by the IRS unless criminal tax prosecution is sought or an Order of Court is obtained." We review the district court's order for abuse of discretion. *See United States v. Columbia Broadcasting System*, 666 F.2d 364, 368 (9th Cir.1982).

The Government argues that the district court's order conflicts with the disclosure provisions of 26 U.S.C. § 6103. Those provisions, the Government suggests, are the exclusive limitations upon IRS disclosure of return information. In addition, the Government argues that the order represents an improper attempt to enjoin the IRS from obeying a duly enacted federal law.

 We recently rejected this argument in *Author Services*, and held that a district court's order restricting the IRS' ability to disclose summoned materials to other governmental agencies, "[r]ather than being an abuse of discretion, ... [could] be a wise exercise of control." *Author Services*, 804 F.2d at 1526. The dis-

trict court's order in this case allows the court to monitor the IRS' use of the summoned documents. This is an appropriate exercise of the district court's discretion: "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Powell*, 379 U.S. at 58, 85 S.Ct. at 255. *See S.E.C. v. ESM Government Securities, Inc.*, 645 F.2d 310, 316–17 (5th Cir.1981). A district court may, when appropriate, condition enforcement of a summons on the IRS' agreeing to abide by disclosure restrictions. *Author Services*, 804 F.2d at 1525 (citing *United States v. Texas Heart Institute*, 755 F.2d 469, 481 (5th Cir.1985)).

The Intervenors also argue that the district court's order violates 26 U.S.C. § 7421(a) (the "Anti-Injunction Act"), because it has the effect of enjoining the IRS from disclosing the summoned tax information. We reject the argument for the reasons stated in *Author Services*, 804 F.2d at 1526.

### F. *Exhibit 5–C ("the Tapes")*

■ The district court's rulings on the scope of the attorney-client privilege involve mixed questions of law and fact, and are reviewable *de novo*. *See McConney*, 728 F.2d at 1202. Where the relevant scope of the attorney-client privilege is clear and the decision that the district court must make is essentially factual, however, the district court's rulings as to the privilege are reviewed for clear error. *Id.* at 1200.

■ The Government contends that the district court erred in finding that the "common interest" rule covered the tapes. The "common interest" rule protects communications made when a nonparty sharing the client's interests is present at a confidential communication between attorney and client. The paradigm case is where two or more persons subject to possible indictment arising from the same transaction make confidential statements that are exchanged among their attorneys. *See*

*Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir.1965).

The Government is incorrect, however, in arguing that the "common interest" rule is limited to such a case. Even where the non-party who is privy to the attorney-client communications has never been sued on the matter of common interest and faces no immediate liability, it can still be found to have a common interest with the party seeking to protect the communications. *See Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 44–45 (D.Md.1974); *Stanley Works v. Haeger Potteries, Inc.*, 35 F.R.D. 551, 554–55 (N.D.Ill.1964).

■ The district court found that the parties present at the meetings recorded on the tapes "had a common interest" in sorting out the respective affairs of the Church and Mr. Hubbard. We agree. All of the non-lawyers present at the meeting were employees of the Church.

■ The Government also challenges the district court's finding that the Church did not waive its attorney-client privilege when it inadvertently delivered the tapes to Armstrong. (Hubbard's personal secretary gave Armstrong the tapes under the mistaken impression that they were blank.) In *Transamerica Computer Co., Inc. v. International Business Machines, Corp.*, 573 F.2d 646 (9th Cir.1978), we held that whereas a waiver of the attorney-client privilege occurs when a holder of the privilege voluntarily discloses the privileged matter, no waiver occurs if the holder has no opportunity to claim the privilege or if the holder was erroneously compelled to disclose the privileged matter. *Id.* at 651. The secretary's delivery of the tapes to Armstrong was sufficiently involuntary and inadvertent as to be inconsistent with a theory of waiver.

■ The Government challenges the district court's ruling that the "crime-fraud" exception to the attorney-client privilege did not apply to the tapes. The attorney-client privilege does not protect communications that further a crime or fraud. *See United States v. Hodge and Zweig*, 548

F.2d 1347, 1354 (9th Cir.1977). The Government had the burden of making a prima facie showing that the attorney-client communications recorded on the tapes were in furtherance of an intended or present illegality. *Id.* We agree with the district court's conclusion that the Government failed to satisfy this burden.

The Intervenors argue that the Government's evidence of crime or fraud must come from sources independent of the attorney-client communications recorded on the tapes. In support of this argument, they cite *United States v. Shewfelt,* 455 F.2d 836 (9th Cir.1972). In *Shewfelt,* we said that "before the privileged status of [attorney-client] communications can be lifted, the government must first establish a prima facie case of fraud *independently* of said communications." *Id.* at 840 (emphasis added). Notwithstanding *Shewfelt,* the Government argues that in assessing the applicability of the "crime-fraud" exception to the tapes the district court should have considered evidence of the contents of the tapes which the Government presented to the court.

*Shewfelt*'s independent evidence requirement has been strongly criticized. In *In re Berkley and Co., Inc.,* 629 F.2d 548, 553 n. 9 (8th Cir.1980), the Eighth Circuit observed that the two cases cited in *Shewfelt,* assertedly in support of the independent evidence requirement, in fact simply state that a party seeking disclosure under the "crime-fraud" exception must make a prima facie showing of crime or fraud in order to shift the burden of showing the inapplicability of the exception to the party resisting disclosure.

In the fourteen years that have passed since *Shewfelt* was decided, only one court has cited it as authority for the independent evidence requirement. *See Kockums Industries Limited v. Salem Equipment, Inc.,* 561 F.Supp. 168, 171 (D.Or.1983). By contrast, a number of courts have rejected the *Shewfelt* position. *See, e.g., In re Sealed Case,* 676 F.2d at 815; *In re Special September 1978 Grand Jury,* 640 F.2d 49, 59 (7th Cir.1980); *In re Berkley,*

629 F.2d at 553 n. 9; *Coleman v. American Broadcasting Companies, Inc.,* 106 F.R.D. 201, 207 n. 9 (D.D.C.1985); *United States v. King,* 536 F.Supp. 253, 262 (C.D. Cal.1982).

In *Hodge and Zweig,* we discussed the "crime-fraud" exception at length without ever referring to *Shewfelt.* 548 F.2d at 1354–55. Instead, we referred repeatedly to *United States v. Friedman,* 445 F.2d 1076 (9th Cir.1971), a decision which implicitly recognized that a district court may examine the disputed communications themselves in order to determine the applicability of the "crime-fraud" exception. *Id.* at 1354.

In this case, the communications recorded on the tapes appear to be the Government's best evidence establishing the applicability of the "crime-fraud" exception. This is not surprising, since the illegal advice allegedly given by Church attorneys to Church officials is an integral part of the intended illegality that the Government seeks to establish. The court's observation in *King* is pertinent: "[S]ince the illegal advice is usually given in the attorney-client setting, applying *Shewfelt* to such cases would, in most instances, simply serve to insulate dishonest attorneys from prosecution for obstruction of justice." *King,* 536 F.Supp. at 262.

In *King,* the court speculated that "the independence test set forth in *Shewfelt* does not appear to be the law in the Ninth Circuit." *Id.* We cannot agree. Whatever the merits of the criticisms that have been leveled against *Shewfelt*'s independent evidence requirement, we are bound to adhere to our holding in *Shewfelt* unless and until it is reversed by an *en banc* panel of this court. *See United States v. Spilotro,* 800 F.2d 959, 967 (9th Cir.1986); *Atonio v. Wards Cove Packing Co., Inc.,* 768 F.2d 1120, 1132 n. 6 (9th Cir.1985).

The Government's independent evidence of intended illegality consists primarily of: 1) Agent Petersell's Supplemental Declaration of March 8, 1985, in which Petersell stated that his discussions with Gerald Armstrong had given him reason to believe

that the communications recorded on the tapes focused generally on the intentional violation of the tax laws; and 2) Petersell's Supplemental Declaration of March 15, 1985, in which Petersell stated that his discussions with three other former Church employees had given him reason to believe that the communications recorded on the tapes specifically focused on i) a proposed scheme whereby the Church's cash transfers to Hubbard would be disguised as payments for services rendered (allegedly to insulate Hubbard from tax liability and to protect the Church's tax-exempt status), and ii) a proposed scheme whereby Hubbard would be able to control royalty income derived from the "Trademark Trust" (a trust that was created to manage Hubbard's various Scientology-related and other trademarks) without that control being traceable to him.

We agree with the district court that this evidence, while not altogether insubstantial, is not sufficient to make out the requisite prima facie showing of intended illegality.

AFFIRMED.