226 N.J. Super. 461 (1988)
544 A.2d 893
IN RE STATE COMMISSION OF INVESTIGATION SUBPOENA NUMBER 5441.
Superior Court of New Jersey, Appellate Division.
Argued June 15, 1988.
Decided July 25, 1988.
*463 Before Judges KING, GAULKIN and GRUCCIO.
Stephen J. Edelstein argued the cause for appellant New Jersey School Boards Association (Schwartz, Pisano, Simon & Edelstein, attorneys; Lawrence S. Schwartz, of counsel; Schwartz and Edelstein and Laura Bertollo, on the brief).
Ileana N. Saros, Counsel, argued the cause for respondent State Commission of Investigation.
The opinion of the court was delivered by GAULKIN, J.A.D.
New Jersey School Boards Association (NJSBA) appeals from a final order denying its motion to quash a subpoena duces tecum issued by the State Commission of Investigation (SCI) for the production of a report prepared by Thomas W. Greelish as special counsel to NJSBA. The motion judge held (1) that the report was a privileged attorney-client communication and (2) that the SCI had failed to establish a sufficient justification for piercing that privilege, but (3) that the NJSBA had waived the privilege by disclosing the report to trustees of the New Jersey School Boards Association Insurance Group (Group). We agree with the judge's conclusions (1) and (2) but reject his conclusion (3). We accordingly hold that the subpoena must be quashed.
The relevant facts, disclosed in the parties' certifications and attached documents, are undisputed. On or about July 15, 1987, Greelish's firm was retained as special counsel by NJSBA to conduct an investigation, render legal advice, make recommendations and take appropriate steps in anticipation of litigation arising from alleged improprieties in the investment program of the Group. In performing those services, Greelish examined documents provided by NJSBA and the Group, conducted interviews and legal research, engaged an accounting firm and prepared a written report. Greelish distributed copies of the report to NJSBA directors and alternates at a September *464 11, 1987 meeting. No other persons were present at that meeting; Greelish collected and retained custody of each copy of the report at the conclusion of the meeting. On September 23, 1987, copies of the report were distributed and collected in a similar fashion at a meeting of the voting trustees of the Group. Those trustees had been allowed access to the report by express authorization of the NJSBA directors and upon Greelish's advice that such disclosure would not waive any privilege or breach any confidence.
On October 2, 1987, the SCI adopted a resolution to investigate the management of the Group. In support of that investigation, the SCI issued its subpoena 5441, dated October 15, which commands only the production of the Greelish report. The subpoena recites that the subject of the investigation is
Whether the laws of the State of New Jersey are being faithfully executed and effectively enforced in connection with the management of the New Jersey School Boards Association Insurance Group, whether the laws regulating the Insurance Group are adequate to protect the interests of the State of New Jersey, and whether the Insurance Group, its officers and employees are faithfully and effectively discharging their duties.
On November 18, 1987, the SCI adopted a second resolution broadening the scope of its investigation to include the management of NJSBA as well. On November 12 and 19, 1987, the SCI issued subpoenas to the executive director of NJSBA commanding the production of a broad range of financial records of NJSBA and the Group from July 1, 1985 forward. Both NJSBA and the Group represent that they have complied fully with the latter subpoenas.
Based on those facts, the motion judge properly held, and the SCI concedes, that the Greelish report was a privileged attorney-client communication. See N.J.S.A. 2A:84A-20. Substantially for the reasons expressed in his February 23, 1988 oral opinion, we are also satisfied that the motion judge correctly found that the SCI had not shown sufficient justification to pierce the privilege. See In re Kozlov, 79 N.J. 232, 243-244 (1979). Based on our evaluation of the relationship between *465 NJSBA and the Group, however, we find that the judge erred in concluding that the disclosure of the report to the Group trustees waived the privilege.
NJSBA is a body corporate and politic created by N.J.S.A. 18A:6-45. All boards of education of the various school districts in New Jersey are members. Id. The board of directors is comprised of the NJSBA president, executive director, immediate past president and five vice presidents, and 25 members from various boards of education throughout the state.
The Group was formed in 1983 pursuant to N.J.S.A. 18A:18B-3, which authorizes two or more boards of education to form a school board insurance group to "participate in any joint self-insurance fund or funds, risk management programs or related services offered or provided by the group." Membership in the Group is open to all New Jersey boards of education. The Group is governed by a board of 9 trustees, consisting of the president of NJSBA, three NJSBA directors, three members of boards of education which are members of the Group, a school business official in a district which is a member of the Group and a superintendent in a district which is a member of the Group. All trustee appointments are made by the NJSBA president with the advice and consent of the NJSBA board of directors. The president of NJSBA also appoints the chairman and vice-chairman of the Group board of trustees. The Group bylaws provide that the executive director of the NJSBA or his designee shall serve as administrator of the Group and that the general counsel of NJSBA may accept service of process on behalf of the Group. At the time of the trial court hearing, the Group was physically located within the NJSBA offices and the costs of professional and support staff were allocated between NJSBA and the Group.
In finding that the attorney-client privilege had been waived, the motion judge noted that NJSBA and its Group were "clearly separate and distinct entities." He rejected the argument that the two were so interrelated that disclosure of the report *466 to the Group trustees ought not result in waiver of NJSBA's privilege:
To use a very basic example, consider this hypothesis. A brother and sister are members of the same family but each is a separate individual just as are these two corporate bodies. They can contract with one another, they can sue each other just as in the case of the movant and the board or the group  insurance group, they can share living quarters, they can share employees but they are still separate individuals. But, if brother and sister are in that family relationship and brother hires an attorney and then brother discloses to sister a confidential attorney-client matter, that matter's no longer privileged. In its most unsophisticated form, that is what happened here.
While NJSBA and its Group are unquestionably distinct legal entities, we do not find that fact to be determinative. To be sure, a voluntary delivery of a privileged communication by a holder of the privilege to someone not a party to the privilege generally waives the privilege. See e.g., United States v. Zolin, 809 F.2d 1411 (9th Cir.1987). But courts have interpreted that principle in a commonsensical way, fashioning a "common interest" doctrine which protects communications made to a non-party who shares the client's interests. See Zolin, 809 F.2d at 1417; Weil Ceramics & Glass, Inc. v. Work, 110 F.R.D. 500 (E.D.N.Y. 1986); Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146 (D.S.C. 1974); Ins. Co. of North America v. Superior Court, 108 Cal. App.3d 758, 166 Cal. Rptr. 880 (Ct.App. 1980).
The reported cases have not described the scope of the "common interest" doctrine with any precision. Zolin, for example, says that the "rule protects communications made when a nonparty sharing the client's interests is present at a confidential communication between attorney and client," but that "[e]ven where the non-party who is privy to the attorney-client communications has never been sued on the matter of common interest and faces no immediate liability, it can still be found to have a common interest with the party seeking to protect the communications." 809 F.2d at 1417. Duplan says that a "community of interest" exists where different persons or separate corporations "have an identical legal interest with respect to the subject matter of a communication between an *467 attorney and a client concerning legal advice.... The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." 397 F. Supp. at 1172. See also Weil Ceramics, 110 F.R.D. at 502. Ins. Co. of North America states the doctrine more broadly: "no waiver of the attorney-client privilege occurs by reason of disclosure of confidential communications to business associates to whom disclosure is reasonably necessary." 166 Cal. Rptr. at 885.
Despite their varying articulations of the doctrine, however, the cases have reached essentially consistent results. Thus, for example, in Zolin the court found the attorney-client privilege to protect tapes made at a meeting attended by non-clients since all attendees had a common interest in "sorting out the respective affairs" of the clients. 809 F.2d at 1417. In Duplan, the court found that patent owners and their licensees had the requisite community of interest to protect communications made among them. Cf. Stanley Works v. Haeger Potteries, Inc., 35 F.R.D. 551, 554 (N.D.Ill., 1964). And in Weil Ceramics, separate corporations were found to have the requisite community of interest both because they shared "a single grandparent" corporation and because they were parties to a litigation and shared identical interests in its outcome. 110 F.R.D. at 503. Cf. Ins. Co. of North America, 166 Cal. Rptr. at 883-884.
Similar considerations lead us to conclude that NJSBA and its Group have a sufficient community of interest to permit NJSBA to disclose the Greelish report to the Group trustees without waiving the privilege. The two entities are formally interrelated, the Group having been created at the instance of NJSBA. The operations of the entities are at least as closely intertwined as are sister or parent-subsidiary corporations: NJSBA directors comprise one-third of the Group's board of trustees, all Group trustees are appointed by the NJSBA president and directors, and the NJSBA executive director is the administrator of the Group. Because of their interrelationships, NJSBA and the Group have a common interest in the operation of the Group and the SCI investigation of the Group. *468 Indeed, Greelish was retained because of NJSBA's direct and patent interest in the operations of the Group. Moreover, the fact that the SCI expanded its investigation to include NJSBA is persuasive evidence (1) that the SCI itself recognizes the close connection between NJSBA and the Group and (2) that NJSBA and its Group have identical legal interests as targets of the investigation.
For all of those reasons, we are satisfied that the disclosure of the Greelish report to the Group trustees did not constitute a waiver of NJSBA's attorney-client privilege. In light of that holding, we need not address NJSBA's further claims of work-product and self-critical analysis privilege.
The February 29, 1988 order is reversed. The matter is remanded to the Law Division for entry of judgment quashing subpoena 5441.