**RESOLUTION TRUST CORPORATION,**
**Plaintiff,**

v.

**Clayton J. DEAN, et al., Defendants.**

**Nos. CIV 91–2026 PHX EHC,**
**CIV 92–0304 PHX RCB.**

United States District Court,
D. Arizona.

Jan. 29, 1993.

---

Roger R. Marce, Richard C. Sanders, Hill Lewis & Marce, Phoenix, AZ, Bruce Alan Ericson, Pillsbury Madison & Sutro, San Francisco, CA, for plaintiff.

Gary L. Stuart, Jennings Strouss & Salmon, Phoenix, AZ, for defendants.

## ORDER

CARROLL, District Judge.

This cause comes before the Court on defendant Symington's Motion to Compel the production of a June 12, 1991 internal memorandum, prepared by and in the possession of the RTC.

### Factual Background

On September 13, 1991, The Washington Post published an article entitled "Governor's Use of S & L Challenged." The opening paragraph of the article reads:

Arizona Gov. J. Fife Symington engaged in "blatant self-dealing" while a director of a now failed Phoenix savings and loan and should be sued for recovery of millions of dollars of taxpayer funds, according to an internal memo by high-ranking government lawyers.

See Motion to Compel, Exhibit 1.

Much of the Post article concerns Symington's relationship with Southwest Savings, as described in the RTC internal memorandum. Particular emphasis is placed upon Symington's involvement in the development of the Camelback Esplanade, a hotel, office and retail project in central Phoenix. Purportedly quoting the RTC memorandum, the Post article states that "Symington spent Southwest's funds with reckless abandon ... [h]e reaped a huge personal financial benefit and then walked away from the [Camelback Esplanade] project virtually untouched." The Post article also states that the RTC memorandum discusses issues concerning the Camelback Esplanade development such as the money invested by Symington and Southwest and their respective potential profits, the development commission collected by Symington, and alleged overspending on soft development costs.

The RTC internal memorandum referred to by the Post article was written by Suzanne Rigby, a senior attorney for the RTC assigned to the Professional Liability Section. The RTC calls the memorandum an "Authority to Sue Memorandum" ("ATS Memo"). In it, according to the RTC, Rigby summarizes the RTC investigation, de-

lineates possible claims, discusses possible defenses, estimates the probability of winning, estimates the cost of the case and the probable recovery, and recommends that authority to sue be granted as to certain specified claims and certain specified individuals. Opposition at 3. The RTC contends that many subjects discussed in the ATS Memo did not appear in the Post article. Affidavit of Rigby at para. 10.[1]

The ATS Memo was marked "Confidential" at the top of each page. Affidavit of Rigby at para. 7. Copies of the memorandum were allegedly sent only to high ranking RTC/FDIC officials, RTC/FDIC attorneys with a "need to know" of the actions recommended in the ATS Memo, and to the RTC's outside counsel retained to bring suit against certain officers and directors of Southwest. *Id.*

According to Clark Blight, the Assistant Inspector General for Investigation of the RTC's Office of Inspector General (RTC OIG), an investigation was commenced in September 1991, to determine who, if anyone, at the RTC had disclosed the ATS Memo to the Post. Affidavit of Clark Blight. To this date, the leak of the ATS Memo has not been explained. *Id.*

### Argument

The RTC argues that the ATS memo is not subject to discovery because it is protected under the attorney-client privilege, the work product doctrine and the deliberative process privilege. The RTC contends that Symington seeks to capitalize on an unauthorized illegal leak of a privileged internal memorandum. Symington argues that the RTC has failed to satisfy its burden of showing a non-waiver of the privileges which may have applied to the ATS memo before it was leaked.

1. Notably, there is very little factual information that can be gleaned from the Post article that cannot be found in the RTC's Complaint against the Southwest defendants. However, there is a reference to a proposed charge of conversion against Symington and that staff attorneys put the likelihood of winning such a claim at 60 percent. There is also a statement that at least some of the defendants may be fully insured against legal claims through an agreement with defendant Ludwig. There is also a statement that Symington engineered a 50

### Attorney–Client Privilege

■ The RTC claims that the ATS memo is protected from disclosure because it constitutes a confidential communication under the attorney-client privilege. The purpose behind the attorney-client privilege is to promote complete and candid communications between attorneys and their clients in order to allow attorneys the ability to render informed and sound legal advice. *Upjohn v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The privilege is to be strictly construed. *United States v. Zolin,* 809 F.2d 1411 (9th Cir.1987).

■ In order to establish the applicability of the attorney-client privilege to a given communication, the party asserting the privilege must affirmatively demonstrate non-waiver of the privilege. *Id.* The voluntary delivery of a privileged communication by a holder of the privilege to someone not a party to the privilege waives the privilege. *Id.*

■ Defendant Symington argues that through the disclosure of the ATS memo, the RTC lost any protection that it may have possessed under the attorney-client privilege. The RTC rejoins that the disclosure was an unauthorized and criminal act and does not amount to a waiver of the privilege.[2] To support this argument, the RTC relies on *In re Grand Jury Proceedings Involving Berkley & Co.,* 466 F.Supp. 863, 869–70 (D.Minn.1979). In *Berkley,* the Government sought to present certain documents to a grand jury that it obtained from a former employee of Berkley. Berkley claimed that the documents sought to be introduced had been stolen by the former employee.

percent salary increase for a key official during the period the Camelback project was approved.

2. Disclosure of confidential government information to a reporter is a crime. 18 U.S.C. § 1905. It also violates RTC regulations and policies. 12 C.F.R. § 1605.10 (1991); 12 C.F.R. §§ 309.6(b), 310.10(a) (1991). If an attorney was involved, the leak would violate ethical rules. Rule 1.6 D.C. Rules Prof. Conduct.

The district court held that to the extent the documents can be viewed as stolen, they should not lose the protection of the attorney-client privilege. *Id.* at 869. The court considered the actions of the former employee as roughly analogous to those of an attorney who acts in bad faith toward his client and discloses privileged communication without the client's approval and against the client's interest. *Id.*

The *Berkley* court directed the government to turn the documents over to the court for an *in camera* inspection to determine the privileged status of each document. *Id.* The court also ordered Berkley to provide information as to the manner in which it maintains its records. *Id.* at 870. In this regard, the court stated that Berkley would have to establish that the materials were available to corporate employees only on a fairly firm need to know basis and that the documents were segregated from other non-confidential corporate documents or otherwise clearly identified as privileged, confidential materials.[3] *Id.*

Symington argues that the RTC's reliance on *Berkley* is misplaced because in this case, unlike *Berkley*, there has been no evidence that a thief took and disclosed the ATS memo. This argument rests on a narrow reading of *Berkley*, for although there is no evidence of thievery in this case at bar, there is an indication that the disclosure of the documents was in itself a criminal act.

The RTC also relies on *In re Dayco Corp. Derivative Securities Litigation*, 102 F.R.D. 468 (S.D.Ohio 1984). In that case, a derivative securities action, the plaintiffs moved for the production of certain documents, collectively referred to as a diary, compiled by a defendant while in the employ of Dayco. Plaintiffs argued that the diary was a business record. *Id.* at 469. Most of plaintiffs' information concerning the diary appeared to come from a newspaper account of some aspects of the litigation. *Id.* The diary had been obtained by the newspaper through an un-

identified source. *Id.* The defendants averred that only senior employees and officers of the defendant, and defendant's counsel and accountants had been permitted access to the diary and that disclosure of the diary had not been authorized. *Id.* at 470.

Following an *in camera* review, the court found that both the attorney-client privilege and the work product doctrine protected the diary. *Id.* The court held that, absent any indication that the defendants voluntarily gave the diary to the press, publication of excerpts of the diary should not be considered a waiver of the privilege. *Id.* citing J. Weinstein & M. Berger, Weinstein's Evidence, para. 503(a)(4)[01] at 503–31 (1982 ed.) ("Communications which were intended to be confidential but are intercepted despite reasonable precautions remain privileged.") The court also noted that plaintiffs did not demonstrate the sort of substantial need or undue hardship which could justify invasion of the privilege. *Id.*

Symington argues that the reasoning in *Dayco* is inapposite because the evidence here suggests a voluntary disclosure of the ATS memo. Symington's argument in support of the Motion to Compel is as follows: Because the RTC represents to the Court that the ATS memo was prepared and maintained in accordance with secure record keeping procedures, and because the distribution of the ATS memo was limited to senior officials and outside counsel, the Court should infer that the disclosure of the ATS memo was a knowing and deliberate waiver of the document's confidentiality. The *Dayco* court, however, refused to draw such an inference when presented with similar circumstances.

■ A party seeking to invoke the attorney-client privilege has the burden of affirmatively demonstrating non-waiver. *Zolin, supra*. The RTC has come forward and presented testimony, under penalty of perjury, affirmatively demonstrating that they took precautions to secure the confi-

---

**3.** Following the *in camera* review, the court held that some documents were privileged, while other documents had never been privi-

leged. The Eight Circuit affirmed. 629 F.2d 548, 552, 556 (8th Cir.1980).

dentiality of the ATS memo and that the memo's leak remains inexplicable. Finding the present circumstance roughly analogous to those in *Berkley* and *Dayco*, the Court finds that the RTC did not voluntarily waive any attorney-client privilege it would have possessed, but for the disclosure.

Because the Court's decision rests on the non-waiver of the attorney-client privilege, the Court will not address the arguments concerning the work product doctrine or the deliberative process privilege.

Accordingly,

IT IS ORDERED denying defendant's Motion to Compel (Dkt. # 95).