NIAGARA MOHAWK POWER CORPORATION; Long Island Lighting Company; New York State Electric & Gas Corporation; Rochester Gas and Electric Corporation; and Central Hudson Gas & Electric Corporation, Plaintiffs,

v.

STONE & WEBSTER ENGINEERING CORPORATION, ITT Fluid Products Corporation, and ITT Fluid Technology Corporation, Defendants.

No. 88–CV–819.

United States District Court,
N.D. New York.

May 25, 1989.

---

Hiscock & Barclay, Syracuse, N.Y., Swidler & Berlin, Washington, D.C., for plaintiff Niagara Mohawk Power; Richard K.

Hughes, Syracuse, N.Y., John R. Ferguson, Washington, D.C., of counsel.

Kirkland & Ellis, Chicago, Ill., Hancock & Estabrook, Syracuse, N.Y., for plaintiffs Long Island Lighting, New York State Electric & Gas, Rochester Gas & Electric and Central Hudson Gas & Electric; G. Christian Kronberg, Chicago, Ill., Donald J. Kemple, Syracuse, N.Y., of counsel.

Mudge Rose Guthrie Alexander & Ferdon, New York City, Costello Cooney & Fearon, Syracuse, N.Y., for defendant Stone & Webster Engineering; Harold G. Levison, New York City, Vincent O'Neil, Syracuse, N.Y., of counsel.

McNamee Lochner Titus & Williams, Attorneys for Defendants ITT Fluid Products & ITT Fluid Technology, Albany, N.Y., Pepper Hamilton & Scheetz, Philadelphia, Pa., for defendants ITT Fluid Products & ITT Fluid Technology; Scott A. Barbour, Albany, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

### I. Overview

The plaintiffs are five utilities who own, operate, and are tenants in common (together "the Cotenants") of the Nine Mile Point 2 nuclear power plant in Scriba, New York. The Niagara Mohawk Power Corporation, ("Niagara Mohawk") as the managing cotenant, has been the primary actor in coordinating efforts to develop the nuclear facility. The four other utilities, namely the Long Island Lighting Company, the New York State Electric & Gas Corporation, the Rochester Gas and Electric Corporation, and the Central Hudson Gas & Electric Corporation, played some lesser role in bringing Nine Mile Point 2 ("NMP2") to completion. The plaintiffs have brought this action against Stone & Webster Engineering Corporation ("SWEC"), ITT Fluid Products Corporation, and ITT Fluid Technology Corporation (collectively "ITT") for damages which allegedly resulted from the faulty design and construction of the Nine Mile Point 2 plant.

There are currently a number of motions pending before this court. This memorandum decision and order addresses the following: (1) the motion by plaintiff Niagara Mohawk for a protective order, pursuant to Fed.R.Civ.P. 26(c), to prevent the deposition by SWEC of attorney Steven J. Agresta; (2) the motion by defendant SWEC for a protective order, pursuant to Fed.R.Civ. P. 37(a), compelling William J. Donlon to answer certain deposition questions; (3) the cross motion by the plaintiffs, under Rule 26(c), for a protective order precluding the defendants use and/or retention of certain documents, and (4) the motion by ITT to compel the production of certain documents pursuant to Rule 37(a) Fed.R.Civ.P.

### II. Background

In June of 1971 Stone & Webster Engineering Corporation was retained by the Cotenants as the architect/engineer and construction manager for a nuclear power plant planned to be built in upstate New York. The Nine Mile Point 2 nuclear power plant was to be owned by Niagara Mohawk and four other utilities. Construction commenced on the 1080 megawatt nuclear facility in 1975, the nuclear fuel was loaded in 1986, and NMP2 went into commercial operation in 1988. The plaintiffs hired ITT Grinnell Corporation in 1974 to perform field fabrication and erection of the piping at the nuclear facility. ITT Grinnell's alleged successors in business, and the defendants in this suit, are ITT Fluid Products Corporation and ITT Fluid Technology Corporation (hereafter "ITT").

On April 16, 1982, the New York Public Service Commission (the "PSC") issued a decision stating that its future policy would be to permit Niagara Mohawk and the Cotenants to recoup only those investments in NMP2 that were made prudently. Thereafter, Niagara Mohawk and the Cotenants retained Steven Agresta, a partner in the law firm of Swidler & Berlin, to represent it in an anticipated administrative proceeding before the PSC in which a determination would be made as to which of the capital costs of NMP2 were prudently incurred. This "prudence proceeding" would be of prime importance to the investor

owned utilities who were then in the process of constructing the Nine Mile Point 2 facility. Under the PSC's regulatory scheme, investor owned utilities are only allowed to earn a profit and recoup costs on monetary disbursements which are "prudent." Any non-prudent costs must be borne by the utilities' shareholders rather than the customers. Moreover, the utilities bear the burden of proving the propriety of their capital investments. *See generally,* N.Y.P.S.C. Case 29124, *Proceeding on the Motion of the Commission to Investigate the Prudence of Costs Incurred for the Construction of the Nine Mile Point 2 Nuclear Generating Facility,* (July 3, 1985).

The PSC initiated a prudence proceeding into the costs of NMP2 on July 3, 1985. Attached to the PSC's order were a number of interrogatories to which the utilities were required to respond within 120 days. The PSC staff and the utilities never actually litigated the matter before the Commission. Rather, on the 18th of September, 1985, the staff of the Public Service Commission and the Cotenants filed a joint motion proposing a settlement as to the amount of capital investment in NMP2 which would be deemed to have been prudently incurred.

Between November of 1985 and January of 1986 the Public Service Commission conducted evidentiary hearings on the proposed settlement. During these proceedings the Cotenants submitted testimony, discovery responses, and legal briefs. The PSC adopted a settlement on October 3, 1986, by which the utilities were permitted to place $4.16 billion of the costs of NMP2 into the rate base. According to the utilities this amounted to a disallowance of over $2 billion. The settlement is now on appeal to the Appellate Division of the New York State Supreme Court, preserving the possibility of remand to the PSC for a full prudence proceeding.

A key concern of the parties herein is the extent to which documents prepared in anticipation of the PSC prudence proceeding are subject to discovery in this action. Many of the "prudence documents" are already possessed by defendant SWEC. In fact, SWEC, as the architect/engineer and construction manager of NMP2, was in possession of much of the factual information necessary to respond to the PSC prudence investigation. SWEC also participated in drafting substantial portions of these prudence documents. However, the ITT defendants did not assist in the drafting of any of these materials and currently possess only a limited number of same.

*The Prudence Documents*

A. *The Project Management Book*

In April of 1983, well before the PSC initiated the NMP2 prudence proceeding, the Co-tenants, Swidler & Berlin, and SWEC combined efforts to create documents which attempted to set forth facts and circumstances substantiating the costs of the Nine Mile Point 2 facility. This document, termed the "Project Management Book", was to detail numerous aspects of the design and construction of NMP2 including: an overall description of the role of upper management; engineering and design; quality assurance; quality control; procurement; contract administration; document control; cost estimating and forecasting; construction management; the start-up process; testing, and planning. The Project Management Book (the "P.M. Book") was created to assist the utilities in responding to any questions posed by the PSC as part of the prudence inquiry as well as in the affirmative assertion of their case before the Commission.

The P.M. Book was initiated by an April 1983 letter from Mr. William Donlon, the President of Niagara Mohawk, to Mr. Frank Reis, then President of SWEC, relaying the Co-tenants' plans to assemble information in anticipation of the PSC prudence investigation. That letter stated in part:

We believe that the best way to document the prudent management of the project is to develop a book which would be a detailed history of the project management of NMP2. Such a book would describe, among other things, how engineering drawings were produced and processed, the methods for developing

and revising cost estimates, the project's quality assurance and control programs and the supervision of contractors at the site. This project management book would not be an evaluation of management practices of Stone & Webster or the cotenants. Rather, it would be a detailed description of how the management structure evolved over time. It is our belief that a document neutral in tone and descriptive in nature would be the most persuasive approach to showing effective project management.

In the additional role of what Niagara Mohawk has termed a "paid litigation consultant", SWEC was to assist the utilities and Swidler & Berlin in developing a history of the operation of NMP2 which would help to demonstrate to the PSC that the facility was properly managed and its costs prudently incurred. SWEC was advised that Mr. Agresta was to direct this effort on behalf of Niagara Mohawk and the Co-tenants. For its part, SWEC appointed Harry Reese, a former project manager at NMP2, to head SWEC's fact finding team and coordinate efforts with the Swidler & Berlin firm.

The P.M. Book, according to SWEC, was developed over the course of 18 months and was substantially completed in 1984. Niagara Mohawk, however, contends that this document was never actually completed. In any event, the documents which comprise the P.M. Book are extensive. The P.M. Book was created through a process whereby the SWEC team drafted and re-drafted portions of the book in accordance with a detailed outline and subsequent editorial comments provided by Swidler & Berlin.

### B. The Draft Responses

On July 3, 1985, the PSC commenced its investigation into the management and costs of Nine Mile 2. As part of its investigation the PSC served hundreds of interrogatories on the utilities who own NMP2 requesting information concerning the nuclear plant. The PSC ordered the utilities to respond within 120 days. Mr. Agresta and his law firm were charged by the utilities with drafting responses to the interrogatories. According to the October 10, 1988, declaration of Mr. Agresta, the persons who actually drafted the answers to the PSC's questions were Thomas Lemberg and other attorneys at the Swidler & Berlin firm. Steven Agresta, who has been retained by Niagara Mohawk as a trial counsel in this action, asserts that he did not author or assist in the selection of documents for any of the draft responses.

On July 24, 1985, Mr. Agresta sent draft responses to PSC interrogatories #2 and #8 to Harry Reese for SWEC's comments. It is the plaintiffs' position that they had to send these draft responses to SWEC so that they could be reviewed for accuracy before submission to the PSC. SWEC claims to have also received a revised draft of answers to certain unspecified interrogatories from Swidler & Berlin on September 27, 1985.

The interrogatories required an extensive response. Question #2 of Appendix A stated in part:

For each major management area—project management, construction, engineering, licensing and regulatory affairs, and quality assurance/quality control—the co-tenants shall provide a written description of the methodologies or programs employed by the project in addressing the following managerial functions ...

Question 8 of Appendix A stated in part:

The co-tenants shall explain what techniques were used to measure the performance of project management and to control capital program costs ...

SWEC retained a copy of the draft responses to these questions. These particular draft responses were never filed by the utilities with the PSC as part of the prudence proceedings. Rather, the parties moved to settlement negotiations before any response was required to be formally submitted. However, the plaintiffs were required to make other submissions to the PSC as part of the process whereby the PSC determined whether to adopt the proposed settlement; these documents are on public record.

## 584

### C. Other Prudence Documents

Defendant ITT was not involved in the development of the prudence documents and requests that it be permitted additional discovery to that discussed above. This would include all correspondence and other documents transmitted between Niagara Mohawk, the Co-tenants, and Swidler & Berlin to and from SWEC which were concerned with issues relevant to the present action, as well as reports prepared by the Cotenants' consultants in preparation for the prudence proceeding which were turned over to SWEC. It appears that consultant reports were prepared by Cresap, McCormick & Paget, Bechtel Corporation, and Torrey Pines Technology Inc.

On November 7, 1988, ITT served a demand upon the plaintiffs for the production of documents. On December 12, 1988, the plaintiffs served their response to this document demand objecting to the first 22 of 24 numbered requests as demanding information covered by the attorney/client privilege or protected under the attorney work product doctrine. Currently, however, ITT is in possession of a number of the these documents which were provided either as exhibits to motion papers or given to ITT by SWEC at the deposition of Mr. William Donlon.

SWEC cites the following as documents which it was requested to prepare or comment upon in the course of preparing for the prudence proceeding.

1. July 1985 draft report on management of NMP2 prepared for the New York Public Service Commission.

2. September 1985 draft report on management of NMP2 prepared for the New York Public Service Commission.

3. September 1985 draft report on the Primary Containment Liner prepared for the New York State Public Service Commission.

4. September 1985 draft report on the 1974–75 slowdown prepared for the New York State Public Service Commission.

5. September 1985 draft report on geology prepared for the New York State Public Service Commission.

6. September 1985 draft response to Appendix B to the New York State Public Service Commission order instituting the NMP2 prudence proceeding.

7. Testimony of Messrs. Rinalli, Terry & Goyal dated October 30, 1985, in the New York Public Service Commission Case No. 29124 particularly concerning the 41 "enhancements" at NMP2.

8. The Cresap, McCormick & Paget report entitled "Swidler, Berlin & Strelow Step V—Assessment of Stone & Webster project Management, November 1984, Volumes I and II, including Swidler & Berlin's comments on the report."

These are the types of documents which ITT is apparently seeking to obtain through discovery.

### D. The Donlon Deposition

SWEC deposed William Donlon, Chairman of the Board and Chief Executive Officer of Niagara Mohawk, on November 9, 10, 30, and December 1, 1988. At the deposition the plaintiffs' counsel contested the propriety of questions regarding statements contained in certain prudence documents, instructing his client not to respond. ITT was represented by counsel at this deposition. During the course of the deposition attorneys for SWEC marked as exhibits a number of the prudence documents and turned them over to ITT.

### The Present Proceedings and Motion

On August 1, 1988, Niagara Mohawk and the Co-tenants filed a complaint against SWEC and the ITT defendants for damages arising out of the design, engineering, and construction of NMP2. Through claims sounding in both contract and tort, the plaintiffs seek to recover excess costs associated with the defendants work in such areas as overhead, overtime, delay in project completion, redesign, reconstruction, and other alleged mismanagement. SWEC served an answer on August 30th along with a notice to depose Steven Agresta, plaintiffs' counsel in the prudence proceeding, William Donlon, Chief Executive Officer of Niagara Mohawk, and Paul Briggs, Chief Executive Officer of Rochester Gas and Electric Corporation.

A central issue presented by these motions is whether the prudence documents are subject to discovery. The Cotenants contend that all of the documents are protected work product since they were prepared in anticipation of litigation. Plaintiffs request that the defendants be prohibited from retaining or using any of the prudence documents along with any notes which were made from these documents. Niagara Mohawk asserts that the only relevant information Mr. Agresta could provide is either privileged or protected from disclosure. On this basis Niagara Mohawk seeks to have the deposition of Mr. Agresta precluded, under Rule 26(c), or stayed pending defendants' attempts to secure the same information through other discovery methods. Plaintiffs also seek a protective order barring the deposition questioning of William J. Donlon concerning documents drafted in anticipation of the PSC prudence proceeding.

SWEC and ITT assert that the attorney work product protection does not apply to the prudence documents or, in the alternative, that any protection as to these documents was waived. Moreover, SWEC maintains that the deposition of Steven Agresta should be permitted. SWEC states that it does not intend to question Mr. Agresta about his legal thoughts or conclusions as to the prudence documents. Rather, SWEC will question Agresta about the sources of his facts: the persons and documentary sources of information that he relied upon to create both the draft responses to the PSC's interrogatories and the Project Management Book. Finally, SWEC asserts that Mr. Donlon should be compelled to answer deposition questions concerning the prudence documents as they are fair ground for discovery.

## III. Discussion
### A. Discovery of Prudence Documents

The scope of discovery under the Federal Rules of Civil Procedure is broad.[1] The Rules open to inquiry not only matters which may be relevant to the subject matter of the suit but matters which appear "reasonably calculated to lead to the discovery of admissible evidence."[2] From a review of the complaint in this action it cannot be disputed that the information sought by ITT and the information sought to be retained by SWEC is relevant for the purposes of discovery under the Federal Rules.

"In *Hickman v. Taylor*, ... the Court recognized a qualified immunity from discovery for the 'work product of the lawyer'; such material could only be discovered upon a substantial showing of 'necessity or justification.'" *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 103 S.Ct. 2209, 2212, 76 L.Ed. 2d 387 (1983). The holding of *Hickman* has largely been embodied in Fed.R.Civ.P. 26(b)(3) which outlines "the extent to which trial preparation materials are discoverable in federal court." *Id.* 103 S.Ct. at 213. Rule 26(b)(3) provides in pertinent part:

a party may obtain discovery of documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seek-

---

**1.** As stated in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947):

"[T]he deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of "fishing expedition" serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge what ever facts he has in his possession."

**2.** Fed.R.Civ.P. 26(b)(1) states in applicable part: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

ing discovery has substantial need of the materials in the preparation of his case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. In other words, "three conditions must be met to earn work product protection. The material must (1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." *In re Grand Jury Subpoenas Dated Dec. 18, 1981, etc.,* 561 F.Supp. 1247, 1257 (E.D. N.Y.1982). "Once these conditions are satisfied, the party seeking discovery must establish a substantial need for the material and a practical inability to secure the substantial equivalent thereof by alternate means." *Id.*

■ In ordering discovery, after the required showing has been made by the party seeking discovery, the court "shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories" contained within these documents. Fed.R.Civ.P. 26(b)(3). It is a necessary corollary that protected work product contained in documents and tangible things cannot be obtained through less tangible methods such as the deposition questioning of persons with knowledge of the protected information. *See Hickman,* 67 S.Ct. at 393–94.[3]

■ The work product doctrine has been held to protect documents prepared in anticipation of an administrative proceeding such as the Public Service Commission's prudence proceeding. *Sprague v. Director of Office of Worker's Compensation,* 688 F.2d 862, 869–70 and n. 16 (1st Cir.1982). Rule 26(b)(3) also applies to protect work product materials "prepared for a party's representative, such as an attorney." *Id.* at 870. However, the definition of the term "representative" in Rule 26(b)(3) goes beyond attorney work product and includes the work product prepared on an attorney's behalf. As recited in *Sprague:*

> [T]he Supreme Court noted in *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, [45 L.Ed.2d 141] (1976), [that] the work-product doctrine must "necessarily" apply to materials prepared on an attorney's behalf, *id.* [422 U.S.] at 239 n. 13, 95 S.Ct. at 2170 n. 13, because an attorney must often rely on the assistance of others "in the compilation of materials in the preparation for trial." *Id.* at 238, 95 S.Ct. at 2170. "This view," the Court stated, "is reflected in the Federal Rules of Civil Procedure, see Rule 26(b)(3)...." *Id.* at 239 n. 13, 95 S.Ct. at 2170 n. 13.

688 F.2d at 870. Moreover, work-product documents prepared for litigation in one action are protected from discovery in a subsequent related suit. Fed.R.Civ.P. 26(b)(3) "protects materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation." *F.T.C. v. Grolier Inc.,* 103 S.Ct. at 2213.

■ Many of the prudence documents were prepared or reviewed by SWEC at the

---

**3.** As stated in *Hickman* 67 S.Ct. at 393:

"In our opinion, neither Rule 26 nor any other rule dealing with discovery contemplates production under such circumstances. That is not because the subject matter is privileged or irrelevant, as those concepts are used in these rules. Here is simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties. As such, it falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims.

Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.... Proper preparation of a client's case demands that he assemble information, sift what he considers to be relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.... This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways— aptly though roughly termed ... as the work product of the lawyer."

direction of the plaintiffs or their attorneys and in anticipation of litigation before the PSC. The same is true for the outside consultant's reports on NMP2. Thus, SWEC and the consultants were acting as "representatives" of the plaintiffs within the meaning of Rule 26(b)(3). Therefore, the prudence documents were protected work product for purposes of the PSC's prudence proceeding. The present action is closely related to the prudence proceeding initiated before the PSC. Thus, the prudence documents qualify as protected work product materials for purposes of this litigation. The issue therefore is whether the work product protection was waived as to the prudence documents which were turned over to SWEC.

■ Generally, the work product protection is waived when documents are voluntarily shared with an adversary or when a party possessing the documents seeks to selectively present the materials to prove a point, but then attempts to invoke the privilege to prevent an opponent from challenging the assertion. *United States v. Nobles,* 422 U.S. 225, 239–40, 95 S.Ct. 2160, 2170–71, 45 L.Ed.2d 141 (1975). Moreover, work product protection is waived when protected materials are disclosed in a manner which "substantially increases the opportunity for potential adversaries to obtain the information." *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982); *see GAF Corp. v. Eastman Kodak Co.,* 85 F.R.D. 46, 51–52 (S.D.N.Y. 1979); 8 Wright and Miller, *Federal Practice and Procedure* § 2024 at 209–210 (1970). However, sharing work product material with a friendly party does not waive the work product protection as it applies to an adverse third party. *United States v. Gulf Oil Corp.,* 760 F.2d 292, 295–96 (Temp.Emer.Ct.App.1985); *Western Fuels Ass'n v. Burlington Northern R. Co.,* 102 F.R.D. 201, 203 (D.Wyo.1984). As explained in *United States v. Gulf Oil Corp.,*

> [T]he work product privilege does not exist to protect a confidential relationship, but rather to promote the adversary system by safeguarding the fruits of an

attorney's trial preparations from the discovery attempts of the opponent. The purpose of the work product doctrine is to protect information against opposing parties, rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation.... *A disclosure made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege.*

760 F.2d at 295 (emphasis added) (quoting *United States v. American Tel. and Tel. Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980)). The work product protection is afforded a far broader scope than the attorney/client privilege, the latter being waived when the privileged information is disclosed to anyone, be they friend, foe, or merely neutral, who is outside of the confidence of the attorney client relationship. *See In re Horowitz,* 482 F.2d 72, 80–82 (2nd Cir.1973) (Friendly J.); *United States v. Gulf Oil Corp.,* 760 F.2d at 295; *Matter of Grand Jury Subpoena, Etc., Nov. 16 1974,* 406 F.Supp. 381, 386–87 (S.D.N.Y.1985).

However, courts have been willing to preserve the work product protection over documents in circumstances where the disclosure to a potential adversary was compelled. In *Transamerica Computer Co. Inc. v. International Business Machines Corp.,* 573 F.2d 646 (9th Cir.1978), a court in a prior unrelated lawsuit had ordered expedited production of some 17 million documents by I.B.M. over a three month period. Though I.B.M. made great efforts to maintain the privilege as to certain of these documents, a number of them were still disclosed. In the *Transamerica* case, the plaintiffs sought to make use of the privileged documents disclosed in the previous litigation in its case against I.B.M. The court upheld I.B.M.'s assertion that the documents were protected, finding that there had been a "de facto compulsion" due to "the imposition of an extremely rigorous schedule for discovery." *Id.* at 651.

In *Simpson v. Braider,* 104 F.R.D. 512, 522–23 (D.D.C.1985), the court held that the production of privileged information by a

defendant in a criminal prosecution, that information being necessary to the defendant's assertion of mitigating circumstances in connection with sentencing, could not be considered a voluntary disclosure. Therefore, the documents retained their privileged status in a subsequent litigation. *Id.* at 522. In holding the information protected, the court noted the general reluctance "to find a waiver of a privilege when [protected material] is involuntarily given such as pursuant to a subpoena, or to defend against criminal charges or under circumstances indicating there was realistically no voluntary disclosure." *Id.* at 523. Though the court made this general statement with regard to the waiver of the attorney/client privilege, it applies equally to the work product privilege, the work product protection being broader in scope than the attorney/client privilege. *United States v. Gulf Oil Corp.*, 760 F.2d at 295.

■ Moreover, the protection afforded work product materials is not waived when disclosure occurs through excusable inadvertence. *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir.1987), *cert. granted on other grounds,* — U.S. ——, 109 S.Ct. 257, 102 L.Ed.2d 246 (1988). The *Zolin* court, for example, found that no waiver had taken place with regard to tapes turned over to an adversary by a secretary who was under the mistaken impression that they were blank. *Id.* The knowing release of otherwise privileged documents constitutes a waiver and is not inadvertent, while a simple mistake, "immediately recognized and rectified" is not a waiver of the work product protection. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105–06 (S.D.N.Y.1985) (protected documents inadvertently produced in the course of large scale discovery did not lose protected status).

### Plaintiff's Position

The Cotenants have moved for the entry of a protective order to preclude defendants' use and retention of the prudence documents. Plaintiffs claim that they did not waive the work product protection because (1) SWEC was a consultant at the time of any disclosure and (2) that any disclosure to SWEC was compelled. The Cotenants assert that throughout their relationship with SWEC they never intended to waive the work product protection over the prudence documents, noting that almost all of the documents which were transmitted between plaintiffs and SWEC were marked "Attorney Work Product Privileged and Confidential."

Plaintiffs characterize SWEC's role as that of a "litigation consultant," as well as the architect/engineer and construction manager of the NMP2 project. They maintain, that since the complaint raises no claims against SWEC with respect to work performed as litigation consultants, the documents written or reviewed by SWEC are not needed for their defense. It is asserted that the consultant/client relationship between plaintiffs and SWEC is analogous to one in which an attorney is sued by a client for injuries suffered when hit by a car driven by the attorney. Plaintiffs contend that, as the attorney could not then disclose client confidences obtained while previously defending the client in a divorce action, *see U.S. v. Ballard*, 779 F.2d 287, 292 (5th Cir.), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986), SWEC must maintain the confidential relationship in this suit.

Plaintiffs contend that the practical circumstances surrounding the preparation of materials for the prudence proceeding compelled them to transfer prudence documents to SWEC for review. In the prudence proceeding the Cotenants were required to justify the costs incurred in the construction of NMP2. Failure to do so would result in the costs being disallowed. Since SWEC was in control of the vast majority of information needed to make plaintiffs' case and because billions of dollars were at stake, plaintiffs claim that they were required to employ SWEC to prepare for the proceeding. According to the Cotenants, SWEC was the only party in a position to verify facts contained in the prudence documents. Moreover, because the draft answers to interrogatories were required to be submitted to the PSC,

SWEC's verification of the documents was needed to avoid committing perjury.

The Cotenants argue that utilities should not be placed in a position where they have to choose between protecting their rights in a prudence proceeding and protecting their rights as against the construction manager of a project. It is asserted that, neither SWEC nor ITT have shown a substantial need for the prudence documents, that the defendants are the ones in possession of the vast majority of the facts, and that the plaintiffs have filed with the PSC, and made part of the public record, the prudence material that was actually adopted by the plaintiffs in the course of reaching a settlement with the PSC. The Cotenants assert that defendants can fulfill their discovery requirements without the prudence documents.

Plaintiffs argue that the prudence documents represent the tentative testing of advocacy positions against the facts of the case and therefore should not be subject to use by the opposing parties. The use of lawyer drafts, according to plaintiffs, ultimately interferes with the plaintiffs' right to effective assistance of counsel.

### Defendants' Position

While not conceding that the prudence documents constitute work product, defendants focus their argument on the question of waiver. It is asserted that any protection which may have once attached to the documents was waived because plaintiffs (1) brought suit against SWEC (2) the suit concerned the same subject matter as the prudence documents and (3) the prudence documents had been freely transferred to SWEC. Moreover, defendants assert that plaintiffs admitted in their motion papers concerning the deposition of Steven Agresta that they had waived the work product protection as it related to the prudence documents.

SWEC and ITT contend that the prudence documents are particularly relevant because statements contained therein are inconsistent with the allegations made in the complaint, and thus, may constitute admissions under Rule 801(d)(2) of the Federal Rules of Evidence. Under this theory it is necessary to inquire into the basis of the statements, the process used, and documents relied upon when writing the prudence documents so that defendants can determine (1) whether or not the statements will be admissible and (2) if admissible what evidence will be brought out by the plaintiffs to impeach or temper the damaging admissions.

Defendants maintain that the Cotenants were not compelled to employ SWEC when preparing documents for the prudence proceeding; rather, SWEC could have been requested to provide strictly factual information to the plaintiffs' litigation team, that team then proceeding in a completely confidential manner. Thus, according to defendants, the transfer of the prudence documents to SWEC was neither inadvertent nor compelled. SWEC notes that the plaintiffs spent many years preparing for the prudence proceeding. Under such circumstances there was no time pressure requiring plaintiffs to either use SWEC or go without a thorough defense. SWEC claims that an appropriate analogy to this case is the attorney malpractice action in which an attorney may disclose otherwise privileged communications to defend himself against charges of improper conduct without violating the attorney client privilege. *See e.g. U.S. v. Ballard*, 779 F.2d at 291–92.

SWEC and ITT claim that the subject matter of the prudence documents involves the same matters which are at issue in this suit—the design and construction of the NMP2 project. The work product protection is waived when the documents are disclosed to a person in a manner which substantially increases the likelihood that they will be obtained by an opponent. *See e.g. In re Grand Jury Subpoenas*, 561 F.Supp. 1247, 1257 (E.D.N.Y.1982). Defendants assert that plaintiffs knew SWEC was a potential legal adversary at the time the prudence documents were disclosed. SWEC cites the transcript of the Donlon deposition at pages 299 and 313 to support this position. Though, Mr. Donlon, the President and Chief Executive Officer of

Niagara Mohawk, did not state that plaintiffs were contemplating a lawsuit against SWEC, he did state that he was very disappointed with SWEC's performance as far back as 1980. SWEC argues that such disappointment reveals that there was a potential for an adversary relationship of which the plaintiffs were aware at the time the prudence documents were disclosed to SWEC. By proceeding to disclose the documents in the face of the potential dispute, plaintiffs allegedly waived the privilege.

### Waiver of Work Product Protection

The parties do not draw distinctions between the prudence documents; the plaintiffs request a protective order covering *all* such materials while defendants argue for full disclosure. There are, however, significant differences between the documents which bear on the issue of whether a waiver has occurred. As noted above, the prudence documents fall into three general categories: the Project Management Book, the draft answers to the PSC's interrogatories, and the consultant reports.

This court has determined as a threshold matter that the prudence documents which were transferred to SWEC constitute work product under Rule 26(b)(3) of the Federal Rules of Civil Procedure. The issue, therefore, is whether the plaintiffs waived the work product protection. Generally, the work product protection is waived when protected materials are disclosed in a manner which is either inconsistent with maintaining secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information. *See United States v. Gulf Oil Corp.,* 760 F.2d at 295; *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982); *GAF Corp. v. Eastman Kodak Co.,* 85 F.R.D. 46, 51–52 (S.D.N.Y.1979); 8 Wright and Miller, *Federal Practice and Procedure* § 2024 at 209–10 (1970). However, courts are sometimes willing to preserve the work product protection, as well as the more restricted attorney/client privilege, in situations where the disclosure was essentially compelled. *See e.g. Transamerica Computer Co. Inc. v. International Business Machines Corp.,* 573 F.2d at 651; *Simpson v. Braider,* 104 F.R.D. at 522–23; *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105–06 (S.D.N.Y.1985).

The parties advance many compelling arguments in support of their respective positions concerning discovery of the prudence documents. Two points are of particular relevance to the court's decision in this matter: (1) the President of plaintiff Niagara Mohawk, William Donlon, appears to have been cognizant of the potential for an adversarial legal relationship with SWEC, and (2) the plaintiffs were required to respond to the PSC's interrogatories under penalty of perjury.

The plaintiffs have waived the work product protection with respect to the Project Management Book. This document, though the brainchild of the plaintiffs, was written by Stone & Webster Engineering Corporation in accordance with an outline provided by the plaintiffs. The P.M. Book was not placed in the possession of SWEC by a process which could be termed excusable inadvertence, *see e.g. United States v. Zolin,* 809 F.2d at 1417, or through force of compulsion. *See Transamerica Computer Co. v. International Business Machines Corp.,* 573 F.2d at 651. The document was developed over the course of many years and during a time when the PSC had not yet initiated the prudence proceeding. Moreover, plaintiffs were apparently cognizant of the potential for an adversary legal relationship with SWEC. Under such circumstances the plaintiffs could have created the P.M. Book without SWEC directly assisting in drafting the document. The P.M. Book was, therefore, treated in a manner which "substantially increas[ed] the opportunity for potential adversaries to obtain the information." *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982,* 561 F.Supp. at 1257. Under these circumstances, this court concludes that plaintiffs have waived the protection cover-

ing the P.M. Book; it is properly the subject of discovery.

 This court holds, however, that the draft answers to the PSC's interrogatories have retained their protected status and therefore are *not* subject to discovery by the defendants. These documents were written by the plaintiffs' attorneys, for submission in an adversarial proceeding, and at the direction of a government agency to whom the Cotenants were legally responsible. Thus, the draft answers contained the initial testing of legal opinions and theories by plaintiffs' counsel; this constitutes core work product material. *See Hickman v. Taylor*, 67 S.Ct. at 393. Moreover, the plaintiffs were responsible for being able to substantiate the assertions made in those documents under threat of perjury. Since SWEC was the architect/engineer and construction manager of NMP2, it was the only party in a position to verify the factual assertions contained in the draft answers. Given the relatively short 120 day time period in which the Cotenants were required to develop responses to the PSC's interrogatories, practical circumstances required the Cotenants to disclose the draft answers to SWEC. Under these circumstances there was a "de facto compulsion" to disclose the protected work product in a manner similar to that in *Transamerica Computer Co. v. International Business Machines Corp.*, 573 F.2d 646, 651 (9th Cir.1978).

 The consultant reports present a close question. On the one hand they were written by consultants to the plaintiffs in anticipation of litigation. This would normally subject the documents to the work product protection under Fed.R.Civ.P. 26(b)(3) and (4). However, these documents were turned over to SWEC to be reviewed for factual accuracy as well as edited for style. There is nothing in the record which indicates that the PSC required the consultant reports to be commissioned or submitted as part of the prudence proceeding. These documents were not prepared under strict time constraints or the threat of perjury as were the draft responses to the PSC's interrogatories.

Thus, the disclosure of these documents to SWEC was not under force of compulsion.

Given the evidence that the President and Chief Executive Officer of Niagara Mohawk had serious doubts as to the performance of SWEC as far back as 1980 it is apparent that this was a knowing disclosure to a potential adversary. As noted above, such disclosure operates to waive the work product protection. The Cotenants could have prevented the transfer of the consultant reports to SWEC by requesting verification of the factual assertions contained in the reports while keeping the reports themselves confidential. The transfer of consultant reports to SWEC in 1984 and 1985 was a disclosure of confidential information that was neither necessary or compelled. Therefore, the court denies plaintiffs motion to have the consultant reports returned. Those reports were treated in a manner inconsistent with the maintenance of the attorney work product protection and are now properly the subject of discovery.

### B. The Donlon Deposition

The plaintiffs have moved for a protective order, pursuant to Rule 26(c), to prevent the deposition questioning of William Donlon concerning statements made in certain prudence documents. The basis of this motion is that those documents are protected as work product and, thus, defendant SWEC is barred from employing them in discovery. Now that the work product protection issue is settled, it this court's ruling that Mr. Donlon answer any questions which are based on prudence documents which are not protected work product. Defendants are thus free to ask questions concerning the consultants report and the Project Management Book. However, the defendants are precluded from inquiring into the draft answers to the PSC's interrogatories.

### C. ITT's Motion to Compel Disclosure

 In opposition to ITT's motion to compel the prudence documents plaintiffs argue (1) that the documents constitute protected work product material which has

maintained its protection as against SWEC and is therefore protected from disclosure to ITT (2) that work product which is shared with a litigation consultant maintains its protection as against third parties and (3) that ITT has failed to make the requisite showing under Rule 26(b)(3) (that there is a substantial need and an inability without undue hardship to obtain the equivalent of the prudence documents by other means). Plaintiffs assert that even should this court hold the work product protection waived as to SWEC, ITT should not be provided with the prudence documents. This, because such a denial of discovery would prejudice ITT only to the extent that any party who is denied access to an opposing party's work product is prejudiced. The Cotenants maintain that ITT possesses most of the facts relevant to this suit and that those underlying facts it desires are freely discoverable. Finally, plaintiffs assert that as a large corporation with sophisticated counsel, ITT has the resources to reconstruct a factual history of NMP2 sufficient to litigate this action. Plaintiffs, however, are unable to cite case law which directly supports the proposition that the waiver of a plaintiff's work product protection as to one defendant does not waive the protection as to a second defendant in the same action.

█ Notwithstanding the Cotenants' assertions, this court holds that ITT may proceed with discovery of the non-protected prudence documents under dispute in this motion to the same extent as SWEC. The P.M. Book was developed over the course of many years by persons intimately involved in the construction of NMP2. It is clear that ITT, no matter what its resources, would be "unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). However, even if ITT could reconstruct such a document this court would still order disclosure. Equal access of both defendants to the prudence documents is necessary to place all parties on an equal footing. It would certainly be unfair to permit one defendant to employ documents in discovery and, potentially, at trial while barring a co-defendant from making use of the same documents. ITT would also be prejudiced by the delay involved in being required to piece together information which took years to compile and involved literally millions of documents. However, while ITT may discover and inquire into the non-protected work product material in the same manner as SWEC, it too must return or destroy any answers to the PSC interrogatories which it may have received in the course of this litigation. Defendants may retain their notes of the draft answers to the PSC interrogatories but they are barred from using of the notes in this litigation.

### D. The Agresta Deposition

█ The plaintiffs have moved for a protective order, under Fed.R.Civ.P. 26(c), to prevent the deposition of Steven J. Agresta. Mr. Agresta was counsel for the plaintiffs in the prudence proceeding before the PSC. He has also been retained as trial counsel in the present litigation. SWEC has noticed the deposition of Mr. Agresta. Plaintiffs assert that the deposition of counsel should not be permitted unless there has been a showing that the information sought cannot be obtained by other means. This, because the attorney work product doctrine as well as practice consistent with our system of jurisprudence makes such a deposition an inappropriate method of discovering the desired information.

SWEC wants to ask Mr. Agresta about a number of items which they claim are neither privileged nor protected, including the names of persons and the location of documents which Agresta relied upon when representing the plaintiffs in the prudence proceeding. Defendants also want to question Mr. Agresta about specific statements which were made in the prudence documents in order to determine exactly what information supplied the basis for a particular statement. Moreover, the defendants want to review the process by which the prudence documents were developed so that the credibility of the documents and the potential for impeachment of the statements contained therein can be ascertained.

Defendants claim that there is no better person than Agresta for locating the sources of information relevant to this suit. Defendants claim that they would not inquire into Agresta's mental impressions and legal conclusions with respect to these documents.

The law on this issue seems to be moving toward a position where courts generally will permit the deposition of opposing counsel only upon a showing of substantial need and only after alternate discovery avenues have been exhausted or proven impractical.[4] That is so despite the fact that Fed.R. Civ.P. 30(a) does not afford attorneys any special protection from being deposed.[5] Courts have become critical of the increasing use of depositions against opposing counsel. As stated in *Shelton v. American Motors Corp.:*

> Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and cost of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.

805 F.2d 1323, 1327 (8th Cir.1986). *See N.F.A. Corp. v. Riverview Narrow Fabrics, Inc.,* 117 F.R.D. 83, 84–86 (M.D.N.C. 1987); *In re Arthur Treacher's Franchisee Litigation,* 92 F.R.D. 429, 437–39 (E.D.Pa.1981); *Walker v. United Parcel*

*Services,* 87 F.R.D. 360, 361–62 (E.D.Pa. 1980). Moreover, the deposition of counsel increases the likelihood that the attorney will be called as a witness at trial. Under such circumstances the attorney would normally be disqualified from providing further services. "N.Y.Jud.Law, Disciplinary Rule 5–102(A) (McKinney 1975) of the Code of Professional Responsibility requires that when 'it is obvious that [a lawyer] ... ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial.'" *United States v. McKeon,* 738 F.2d 26, 29 (2nd Cir.1984).

This school of thought also asserts that the act of choosing which documents to review and which persons to interview is itself a reflection of a lawyer's thought process and, as such, is protected work product. For example in *Shelton* the court held that where "the deponent is opposing counsel and has engaged in a selective process of compiling documents from among voluminous files in preparation for litigation, the mere acknowledgment of the existence of those documents would reveal counsel's mental impressions which are protected as work product." *Id.* at 1326. To protect attorney work product, as well as for other prudential reasons, the *Shelton* court limited the deposition of opposing counsel to situations where "the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel ...; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton,* 805 F.2d at 1327 (8th Cir. 1986). There is no Second Circuit case directly on point. The plaintiffs, however, cite *Gould v. Mitsui Mining & Smelting Co.,* which in dicta stated that the *Shelton* court's concern with the deposition of op-

---

**4.** There are instances where the deposition of an attorney is clearly appropriate. This is usually where the attorney is a fact witness or an actor, the creator of non-privileged records, or the attorney's advice is used by the client as a defense. See *N.F.A. Corp. v. Riverview Narrow Fabrics, Inc.,* 117 F.R.D. 83, 85 n. 2 (M.D.N.C. 1987) and cases cited therein.

**5.** Fed.R.Civ.P. 30(a) states simply states that "[a]fter commencement of the action, *any* party may take the testimony of *any person,* including a party, by deposition upon oral examination." Emphasis added. *See Shelton v. American Motors Corp.,* 805 F.2d 1323, 1327 (8th Cir.1986).

posing counsel is "generally well taken." 825 F.2d 676, 680 n. 2 (2nd Cir.1987).

In support of their request that Mr. Agresta submit to a deposition, SWEC first notes that Rule 30(a) does not provide opposition counsel with any special protection from being deposed. There is a basis in case law for the position that an attorney cannot avoid a deposition by asserting that he or she has no relevant, nonprivileged information, *see Cooper v. Welch Foods, Inc.,* 105 F.R.D. 4, 6 (W.D.N.Y.1984); *Shiner v. American Stock Exchange,* 28 F.R.D. 34, 35 (S.D.N.Y.1961), and that, at a minimum, the attorney must submit to a deposition so that his lack of knowledge may be tested and any claimed privilege placed on the record, any motion for a protective order at this time being premature. *Hunt Intern. Resources Corp. v. Binstein,* 98 F.R.D. 689, 690 (N.D.Ill.1983); *Scovill Manufacturing Company v. Sunbeam Corporation,* 61 F.R.D. 598, 603 (D.Del. 1973); *Shiner v. American Stock Exchange,* 28 F.R.D. at 35. Respected commentators have also asserted that the attorney's knowledge concerning the facts and sources of information relied upon in creating work product are not protected work product and may properly be the subject of discovery. According to Wright & Miller, Federal Practice and Procedure: Civil § 2023, p 194 (1970):

> The courts have consistently held that the *work product* concept furnishes *no shield* against discovery, by interrogatories or by deposition, *of the facts that the adverse party's lawyer has learned, or the persons from whom he has learned such facts, or the existence or nonexistence of documents,* even though the documents themselves may not be subject to discovery.

Under this view Mr. Agestra would probably be subject to deposition by Stone & Webster to find out about the people and documents he relied upon while drafting the prudence proceeding papers. This court also notes the strong dissent in the *Shelton* case which argued that the attorney deposition should be allowed in order to discover the existence of documents—

citing the rule as espoused by Wright & Miller.

This court finds that due in part to the potential for the invasion of privileged or protected material, as well as for other prudential reasons discussed above, a protective order, pursuant to Rule 26(c) should issue to stay the deposition of Mr. Agresta. "Because deposition of a party's attorney is usually both burdensome and disruptive, the mere request to depose a party's attorney constitutes good cause for obtaining a Rule 26(c), Fed.R.Civ.P., protective order." *N.F.A. Corp. v. Riverview Narrow Fabrics, Inc.,* 117 F.R.D. at 85. Plaintiffs argue effectively that the same information which is sought in the deposition of Mr. Agresta can be obtained through interrogatories. Niagara Mohawk also cites Rule 30(b)(6) as a feasible alternative to Stone & Webster's request to depose Mr. Agresta. Fed.R.Civ.P. 30(b)(6) provides that a party may name a corporation as the deponent "and describe with particularity the matters on which examination is requested." The corporation then must designate a person to testify on behalf of the corporation and the matters on which that person will testify. If Niagara Mohawk conducts discovery in good faith these devices should be sufficient.

If it should appear that defendants' future discovery progress has been frustrated by plaintiffs' intransigence, and other federal discovery procedures have proven to be futile, the defendants may always return to the court for appropriate relief.

### IV. Conclusion

This court hereby

ORDERS, that:

(1) the motion by plaintiff Niagara Mohawk for a protective order, pursuant to Fed.R.Civ.P. 26(c), to prevent the deposition of Steven J. Agresta is GRANTED;

(2) the motion by defendant Stone & Webster Engineering Corporation for an order, pursuant to Fed.R.Civ.P. 37(a), compelling William J. Donlon to answer certain deposition questions is GRANTED to the extent that he is not questioned concerning statements made in documents which have

been classified as the draft answers to PSC interrogatories;

(3) the cross motion by plaintiffs, under Fed.R.Civ.P. 26(c), for a protective order precluding the defendants use and/or retention of documents which have been termed "prudence documents" is GRANTED in part and DENIED in part as described in the body of this opinion; and

(4) the motion by ITT to compel the production of certain documents, pursuant to Rule 37(a) Fed.R.Civ.P., is GRANTED in part and DENIED in part as described in the body of the opinion.

IT IS SO ORDERED.